# United States Court of Appeals
## For the First Circuit

No. 12-2277

DENISE MCGRATH,
ADMINISTRATRIX OF THE ESTATE OF ANTHONY W. MCGRATH,

Plaintiff, Appellant,

v.

RICHARD T. TAVARES, EDWIN F. ALMEIDA,
ROBERT J. POMEROY, AND THE TOWN OF PLYMOUTH, MA

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert B. Collings, U.S. Magistrate Judge]

Before

Howard, Stahl, and Thompson,
Circuit Judges.

Paul J. Driscoll, with whom Driscoll & Gibson was on brief,
for appellant.
Leonard H. Kesten, with whom Deidre Brennan Regan and Brody,
Hardoon, Perkins & Kesten, LLP were on brief, for appellees.

August 1, 2014

**THOMPSON, Circuit Judge.**   This appeal stems from the tragic deadly shooting of a sixteen-year-old boy named Anthony McGrath ("Anthony") by a Plymouth police officer.   Following the untimely death of her son, Denise McGrath ("McGrath") filed a 42 U.S.C. § 1983 action, alleging the police officers involved had used excessive force in violation of the Fourth and Fourteenth Amendments.   The two named police officers moved for summary judgment.   Finding no constitutional violations on the part of the police officer who fired the lethal shot at Anthony, the district court granted the police officers' motion and dismissed all claims. McGrath appeals the entry of summary judgment.   After reviewing the record anew, we affirm.

## I. FACTUAL BACKGROUND

Because this is an appeal from the entry of summary judgment, we relate the facts in the light most flattering to the nonmoving party -- in this case, McGrath -- "as the record will reasonably allow."[1]   McArdle v. Town of Dracut/Dracut Pub. Sch., 732 F.3d 29, 30 (1st Cir. 2013).

The events surrounding Anthony's death took place in the early morning of January 10, 2006 in Plymouth, Massachusetts. Around 3:15 a.m., on-duty Plymouth police officers Edwin F. Almeida

---

[1] In setting forth the facts of this case, the parties ask us to come up with different versions of what exactly happened that fateful morning, but we remind them that our obligation is to look to the competent evidence in the record, and the facts and reasonable inferences it supports.

and Richard T. Tavares responded to an activated burglar alarm at a liquor store (near the intersection of Samoset and Court Streets).  At the time the dispatch came in, the officers were in their two respective police cars at Standish Plaza (on Samoset Street).  As told by the officers, the following sequence of events transpired in a time span of approximately five minutes.

## A. Officer Almeida's Course

Having received the dispatch, Officer Almeida headed east on Samoset Street towards the liquor store with his police cruiser's blue lights activated.  As he approached the intersection of Samoset and Court, he saw a westbound Toyota Camry stopping at the traffic light.  The light in Officer Almeida's direction was red, but turned green as he approached the intersection.  Simultaneously to the eastbound light turning green, the westbound Camry turned left, and headed south on Court Street.  Believing various traffic violations had been committed, Officer Almeida decided to pull over the Camry.[2]  He took a right on Court Street,

---

[2] At this point, Officer Almeida thought the Camry had made an illegal left turn on a red light -- as it was his understanding that the eastbound green light (his light) had a ten second head start on the westbound green light (the Camry's light) -- and had not yielded to an emergency vehicle.  Further, he had noticed the Camry had a single commercial license plate, rather than the two required of commercial vehicles, and no commercial markings.  At the summary judgment hearing before the district court, McGrath's counsel agreed Officer Almeida could legally stop the Camry once he had called in the plate and received information that the plate did not belong to that particular car.

turning on his cruiser's siren and wigwags.[3]  He radioed dispatch, informing them he had spotted a vehicle leaving the liquor store's vicinity, and was trying to pull it over.

Officer Almeida headed south behind the Camry, but the car did not pull over.  It did eventually slow down at an intersection roughly four city blocks later, at which point Almeida was able to get a quick look at the driver.  But the Camry then took off again.  Officer Almeida -- still with his police cruiser's lights, siren, and wigwags on -- was now in active pursuit.[4]  He radioed dispatch, advising that the driver he was attempting to pull over was refusing to do so, and was on the run.  Officer Almeida witnessed the Camry drive through a bank's drive-through teller window in the wrong direction.  Almeida's lone pursuit of the Camry continued through the streets of Plymouth until Officer Tavares (who had heard the earlier liquor store alarm broadcast) entered the fray.

## B. Officer Tavares's Course

Hearing the initial dispatch to the liquor store and being in the area, Officer Tavares responded as backup for Officer Almeida's alarm investigation.  As he was drawing near to the liquor store, he heard Officer Almeida radio in that he was pulling

---

[3] A wigwag is a device for flashing an automobile's headlamps at a preset rate.

[4] The parties agree this is where Officer Almeida's "pursuit" began.

over a driver in the vicinity of the business.  But Tavares continued heading towards the liquor store in response to the activated burglar alarm.  It was not until Officer Tavares heard Officer Almeida tell dispatch the driver was refusing to stop and was running that he changed course, and told dispatch he would head towards Almeida's location.  With his police cruiser's lights and siren on, Officer Tavares quickly joined the pursuit.

### C. Officers Almeida and Tavares's Shared Course

Officers Almeida and Tavares pursued the speeding zigzagging Camry up Water Street until it reached the T intersection with Nelson Street, where the speeding driver was not able to make the turn on time, and crashed into a stone wall.  The two police officers pulled up behind the Camry:  Officer Almeida parked his cruiser to the rear of the driver's side, and Officer Tavares to the rear of the passenger's side.  Almeida then exited his cruiser, drew his gun, and began shouting commands at the driver to put his hands up and step out of the Camry.  The driver failed to comply with any of Officer Almeida's commands.  Instead, he revved the engine and maneuvered the Camry in reverse between the two police cruisers.  The reversing Camry hit Almeida's cruiser, and continued a couple of yards before it crashed into a telephone pole.

The Camry then remained on the telephone pole for a few seconds.  Officer Tavares was now the one shouting commands.  He

approached the Camry from the front passenger side, instructing the driver to turn off the engine and get out. Officer Almeida was to Officer Tavares's right, also facing the Camry. Both police officers had their weapons drawn and aimed at the driver. The driver, again, did not comply; this time, he was looking straight at Officer Tavares with his hands on the steering wheel. Continuing to ignore the police officers' directives to turn off the car, the record reflects the driver revved the Camry's engine and accelerated forward towards Officer Tavares. Tavares then fired his weapon twice, striking the car's front windshield. One of the shots hit the driver in the upper right arm. As the Camry passed Officer Tavares on his right, and continued in Officer Almeida's direction, Tavares fired two more shots. The fatal shot entered the Camry through the front passenger window and struck the driver in the back. Officer Almeida then fired seven shots, but none struck the driver. After hitting the curb and becoming airborne, the Camry came to a complete stop.

Officer Tavares immediately radioed police dispatch, indicating that shots had been fired, and that an ambulance was needed. He simultaneously approached the Camry from the rear, while Officer Almeida closed in from the front. The driver's door was open and the driver was slumped to the left of the steering wheel. Officer Tavares again yelled at the driver to turn off the car and get out, but the driver did neither. Tavares pulled the

driver from the vehicle and both officers began to handcuff him. Officer Tavares asked the driver several times if he had been shot. There was no response.  Once the driver was handcuffed and placed face down on the ground, the officers began to check him for weapons, and noticed his labored breathing.  They removed the handcuffs and began to cut his clothing to look for injuries.  This was when the officers noticed the gunshot wounds.

Officer Stephen McLaughlin arrived on the scene, and the three officers began to administer first aid.  Officers McLaughlin and Almeida maintained pressure on the wounds and operated the ambu bag,[5] while Officer Tavares performed chest compressions.  Other police officers (who had been rushing to the scene when the Camry initially attempted to flee) also arrived, as did an ambulance. The paramedics took over.  The driver, sixteen-year-old Anthony, was taken to a nearby hospital where he was pronounced dead less than two hours later at 5:01 a.m.

## II. PROCEDURAL HISTORY

On January 5, 2009, McGrath -- as administratrix of her son's estate -- sued Officer Tavares, Officer Almeida, Chief of Plymouth Police Department Robert J. Pomeroy, and the Town of

---

[5] "Ambu bag" is a commonly used proprietary name for a bag valve mask.  A bag valve mask is "an airway apparatus used to cover the patient's nose and mouth and begin ventilating the lungs mechanically by squeezing a reservoir of oxygen or air." Bag valve mask definition, Stedman's Medical Dictionary http://www.medilexicon.com/medicaldictionary.php?t=52985 (last visited July 24, 2014).

Plymouth in the federal district court for the District of Massachusetts.[6] She alleged Officers Tavares and Almeida ("Defendants") used excessive force in violation of the Fourth and Fourteenth Amendments.

Officers Tavares and Almeida moved for summary judgment, averring McGrath "ha[d] not established that the use of deadly force violated Anthony McGrath's Fourth Amendment constitutional rights and, in any event, [they were] entitled to qualified immunity." McGrath opposed the entry of summary judgment, asserting the existence of genuine disputes of material facts.

On July 15, 2011, the district court heard the motion for summary judgment and took it under advisement. On September 4, 2012, it granted summary judgment in Defendants' favor, holding that Officer Tavares's use of deadly force was objectively reasonable as a matter or law, and thus, no constitutional

---

[6] She raised federal and state constitutional claims under the federal civil rights statute, 42 U.S.C. § 1983, and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (1979). She also asserted supplemental state law claims for wrongful death, and assault and battery.

violation had occurred.[7]  It found no need to address the issue of qualified immunity.[8]

McGrath now appeals.

## III. STANDARD OF REVIEW

We review the entry of summary judgment de novo, affirming only if the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  See Bos. Prop. Exch. Transfer Co. v. Iantosca,

---

[7] Because none of Officer Almeida's shots hit Anthony, the district court found there was no seizure -- a necessary element of a claim for an unreasonable seizure as a result of excessive force -- and focused on the four shots fired by Officer Tavares.  We agree that there was no seizure, not solely because none of Almeida's shots hit Anthony, but also because Almeida's missed shots did not restrain Anthony's freedom of movement.  See Scott v. Harris, 550 U.S. 372, 381 (2007) ("A Fourth Amendment seizure occurs . . . when there is a governmental termination of freedom of movement through means intentionally applied." (alterations omitted) (quoting Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989))).  For a Fourth Amendment seizure to occur "a police officer has [to] in some way restrain[] the liberty of a citizen through physical force or show of authority."  United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)) (internal quotation marks omitted).  Here, Officer Almeida's shots, although intended to apprehend Anthony, did not stop or in any way restrain him.  See Brower, 489 U.S. at 599 ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.").

[8] Officers Tavares and Almeida had also moved the district court to enter summary judgment on all remaining claims against all defendants once summary judgment was entered in their favor. Because there could be no municipal or supervisory liability if neither Tavares nor Almeida violated Anthony's constitutional rights, the district court dismissed McGrath's federal claims against Chief Pomeroy and Plymouth.  And with only state law claims remaining, the court declined to assert supplemental jurisdiction, and dismissed them as well.

720 F.3d 1, 10 (1st Cir. 2013).  At the summary judgment stage, we must draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any "conclusory allegations, improbable inferences, and unsupported speculation." Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014) (quoting Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013)).  We do not make any credibility determinations or weigh the evidence.  See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).  We may uphold an entry of summary judgment on any basis apparent from the record.  See, e.g., Bos. Prop. Exch. Transfer Co., 720 F.3d at 10; Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 247 (1st Cir. 2013).

## IV. DISCUSSION

### A. Fourth Amendment

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." Plumhoff v. Rickard, --- U.S. ---, 134 S. Ct. 2012, 2020 (2014).  "[D]etermining the . . . reasonableness of a particular seizure . . . 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  "To establish a Fourth Amendment violation based on excessive force, a plaintiff must show that the defendant officer

employed force that was unreasonable under the circumstances." Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)) (internal quotation marks omitted).

This reasonableness inquiry is an objective one; it is not a question of subjective intent. Graham, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). We evaluate "the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Kenney, 700 F.3d at 609 (quoting Graham, 490 U.S. at 396). Our assessment "must account 'for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" Id. (quoting Graham, 490 U.S. at 396-97). "In the Fourth Amendment context, the use of deadly force is not excessive if an objectively reasonable officer in the same circumstances would have believed that an individual posed a threat of serious physical harm either to the officer or others." Estate of Bennett v. Wainwright, 548 F.3d 155, 175 (1st Cir. 2008) (citations omitted) (internal quotation marks omitted).

McGrath argues the Fourth Amendment did not allow Officer Tavares to use deadly force because he lacked "probable cause" under Tennessee v. Garner, 471 U.S. 1 (1985) -- i.e., "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force," id. at 11. She has maintained from the start that Officer Tavares and Officer Almeida were never in any danger of physical injury or death; particularly, at the time Tavares fired the shot that killed her son (when the Camry accelerated forward from the telephone pole) because neither officer was in "or anywhere near" the Camry's path of travel.[9] Unfortunately for McGrath, the record says otherwise. And she is unable to put forth competent evidence to dispute it.[10]

---

[9] As a sub-argument, McGrath contends the officers acted unreasonably because they violated police department policies. But local policies are not determinative of our constitutional analysis. See Whren v. U.S., 517 U.S. 806, 815 (1996).

[10] We note McGrath does not make any page references to the record in her response to Defendants' statement of undisputed material facts, but flat out denies certain facts (although she sometimes includes an argument or a brief explanation of what she purports the facts to be). Instead, McGrath filed her own separate statement of disputed material facts in which she does cite record evidence. The latter, however, does not reference Defendants' statement of material facts, and thus, has left it up to the court to scour her submissions and connect the dots. Fortunately for McGrath, she filed suit in Massachusetts. Unlike other district courts within our Circuit which have adopted solid anti-ferreting rules, the District of Massachusetts simply requires "[the] party opposing [a motion for summary judgment]. . . include a concise statement of the material facts of record as to which it is

-12-

What she points us to are police photographs of the resulting bullet holes in the Camry in an attempt to show the officers were never in front of the accelerating car. She argues that "from the State Police photographs a lay person could reasonably conclude that the penetration holes in the windshield from Tavares' first and second shots were not made from shots taken directly in front of the Camry," but "from off to the right or passenger side of the Camry." And that, likewise, "[p]hotographs of the bullet holes caused by Almeida's shots into the Camry establish that he was never located 'in front' of the Camry or in its path of travel." But without expert testimony on the trajectory of a bullet, these photographs are not enough to show where an officer was standing when he fired his gun. The Rules of Evidence simply do not permit it. See Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on scientific,

contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." LR, D. Mass. 56.1. The rule does not require an opposing statement denying or qualifying the facts supporting the summary judgment motion to "reference . . . each numbered paragraph of the moving party's statement of material facts" and "support each denial or qualification by a record citation" (like the Districts of Maine and Puerto Rico), D. Me. R. 56(c) and D.P.R. L. Cv. R. 56(c), or to "file a Statement of Disputed Facts, which shall be numbered correspondingly to the Statement of Undisputed Facts, and which shall identify the evidence establishing the dispute" (like the District of Rhode Island), D.R.I. LR Cv 56(a)(3). Accordingly, although inconvenient for us, McGrath is seemingly in compliance with Local Rule 56.1 for the District of Massachusetts.

technical, or other specialized knowledge . . . ."). Moreover, the Massachusetts State Police Collision Analysis & Reconstruction Section Forensic Mapping Report (the only expert testimony on record) cuts against McGrath's assertion, concluding that "[d]ue to a variety of factors . . . it is not possible to accurately represent the exact dynamic trajectories of the bullets as they entered the vehicle."

McGrath also points to a pattern of shattered glass illustrated in both the Dowd forensic map[11] and a sketch of the scene by Lieutenant Gilardi[12] in another attempt to show the officers were not in front of the Camry. McGrath contends that the pattern of shattered glass is a result of Tavares's third shot hitting the Camry's front passenger window, when he was no longer in the car's path, and that it "conclusively establishes that as

_____

[11] State Trooper Timothy Dowd, an accident reconstructionist, prepared this map as part of the police investigation. It is "a forensic map of the area surrounding the intersection of Water Street and Nelson Street," and includes "the area roadways, surrounding structures and surrounding landscape," as well as "evidence and vehicles located within this area." Copies of it were provided to Tavares and Almeida during their respective depositions and each marked up a map to illustrate the chronology of events. Because the Dowd forensic map does not reference either officer, we look to the marked-up maps.

[12] Lt. Gilardi of the Massachusetts State Police Crime Scene Services Section arrived at the scene at approximately 5:30 a.m. Along with other duties, he was tasked to sketch the crime scene. In what is relevant to McGrath's pattern of shattered glass argument, his sketch of the scene shows a group of dots labeled "Glass Frags," and his official report says "[t]here was also broken window glass on the street behind the [Camry]." Nothing more.

the Camry proceeded from the utility pole across Water Street, its course of travel was directly westerly, well to the south of . . . where Tavares [and Almedia] claim[ed] to have been standing when [Tavares] fired shots one, two, and three."  After scouring McGrath's briefs (and filings in district court), however, it is not clear how she purports to establish this.  For the marked-up copies of the Dowd map place the shattered glass on the ground past the point where Officer Tavares was standing when he began to shoot, which the record evidence shows occurred once the Camry was already accelerating forward from the pole.  And Officer Tavares testified Anthony was no longer driving towards him, but towards where he believed Almeida to be, when he fired his third shot (which McGrath claims shattered the front passenger window).  Thus, even employing McGrath's theory, the pattern of shattered glass does not contradict the police account that the Camry initially drove towards the officers.  This is particularly so, given Tavares testified the Camry veered away from him, and towards Almeida, after he fired his first two shots.  As for Lt. Gilardi's sketch, the only mention as to the officers' whereabouts is not in the sketch, but in the accompanying official report, which states "[a]s Plymouth Police officers approached the [Camry], it drove forward in a westerly direction, <u>toward the officers</u> who began shooting at the operator of the [Camry]."  (Emphasis added).

-15-

Accordingly, despite McGrath's claims to the contrary, the uncontroverted facts in the record, as established by the police incident report, and the deposition testimony and marked-up map of each officer, show that when Officer Tavares fired shots one and two, Anthony was driving towards him.[13] The choices were to shoot or risk being run over. This is the type of "split-second judgment" police officers are forced to make, and which we must take into account in assessing an officer's actions. A reasonable officer in this situation could reasonably believe he was facing a threat of serious physical harm, if not death. After all, a car can be used as a deadly weapon. Cf. Scott v. Harris, 550 U.S. 372, 383 (2007) ("[T]he threat posed by the flight on foot of an unarmed suspect [is not] even remotely comparable to the extreme danger to human life posed by [a car chase].").

The police report, the officers' deposition testimonies, and the marked-up maps also establish that when Officer Tavares fired shots three and four, he believed Officer Almeida was to his right, and the Camry was headed in that direction. Contrary to

---

[13] As a general contention, McGrath argues Tavares and Almeida could have lied in the police report and in their depositions. But this broad argument is without merit, for a genuine dispute as to a material fact cannot be created "by relying on the hope that the jury will not trust the credibility of the witness." Sears, Roebuck & Co. v. Goldstone & Sudalter, 128 F.3d 10, 18 (1st Cir. 1997) (citation omitted) (internal quotation marks omitted). "There must be some affirmative evidence" that the officers are lying. Id. There is none in this case, and there is nothing inherently unbelievable about Officer Tavares or Officer Almeida's testimony.

McGrath's contention, Officer Tavares had no duty to turn around and pin down Officer Almeida's exact location. Cf. Plumhoff, 134 S. Ct. at 2023 (stressing an officer had not violated clearly established law "when she fired at a fleeing vehicle to prevent possible harm to 'other officers on foot who [she] believed were in the immediate area'" (alteration in original) (emphasis added)). Again, any reasonable officer in Tavares's position, faced with the same reckless driver who had almost run him over a fraction of a second earlier, could reasonably believe that Officer Almeida was in grave physical harm's way. See id. at 2021 ("[The fleeing suspect]'s outrageously reckless driving posed a grave public safety risk."). Remember, protecting oneself or others from serious physical harm justifies a police officer's resort to deadly force. See Wainwright, 548 F.3d at 175.

From Officer Tavares's perspective, Anthony was dangerous, and he acted accordingly. He faced a driver who led him and another officer in a car chase through downtown Plymouth in the wee hours of the morning, and was refusing to heed to legitimate police officer directives (not only had Anthony refused to stop when police officers attempted to pull him over, but he had refused to follow any police officer commands thereafter). Throughout the car chase, Anthony acted with complete disregard for Officer Tavares and Officer Almeida's safety or the safety of anybody else that might have been on the street. See Scott, 550 U.S. at 383-84

-17-

(looking at the "actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase" when assessing the governmental interest in ensuring public safety). We point out that the chase was still ongoing when Tavares fired his weapon. It did not conclude with the stone wall collision, seeing as Anthony quickly picked up his flight by reversing the Camry in between the police cruisers. See Plumhoff, 134 S. Ct. at 2021 (finding a car chase had not concluded when the suspect's car "collided with a police car and came temporarily to a near standstill," because "[l]ess than three seconds later, [the suspect] resumed maneuvering his car"). Nor did it end when the Camry hit the telephone pole, as Anthony quickly resumed driving forward after that. See id. Under these circumstances, we cannot say Officer Tavares acted unreasonably by shooting at Anthony. "[A]t the moment when the shots were fired, all that a reasonable police officer could have concluded was that [Anthony] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for [the officers, as well as for] others on the road." Id. at 2022. This threat to officer and public safety is precisely the "probable cause" Garner refers to.

In sum, for McGrath to succeed on her Fourth Amendment claim, she must establish that Officer Tavares's shooting at Anthony was not objectively reasonable "in light of the

circumstances and the facts known to [him] at the time." Calvi v. Knox County, 470 F.3d 422, 428 (1st Cir. 2006). She cannot. As we just mentioned, Officer Tavares's use of deadly force was objectively reasonable because a reasonable officer in the same circumstances could have believed Anthony posed a threat of (at the very least) serious physical harm to his person when he fired shots one and two, and an identical threat to Officer Almeida when he fired shots three and four. See Wainwright, 548 F.3d at 175. A reasonable officer could have likewise concluded Anthony "would once again pose a deadly threat for others" if he had resumed his flight. See Plumhoff, 134 S. Ct. at 2022. Moreover, Officer Tavares's third and fourth shots are also justified by Anthony's failure to abandon his attempt to flee after the initial two shots were fired, continuing to pose an imminent threat to the public. See, e.g., id. Because the record does not establish a Fourth Amendment violation, McGrath's claim cannot survive summary judgment.

## B. Qualified Immunity

In any event, even if a constitutional violation was established, Defendants would still be entitled to summary judgment based on qualified immunity because they did not violate clearly established law. We explain.

"An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory

or constitutional right that was clearly established at the time of the challenged conduct." Plumhoff, 134 S. Ct. at 2023 (internal quotation marks omitted). "And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Id. "[E]xisting precedent must have placed the statutory or constitutional question confronted by the official beyond debate." Id. (internal quotation marks omitted).

The burden of demonstrating the law was clearly established at the time of the alleged constitutional violation is on the plaintiff, McGrath. See Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 52 (1st Cir. 2010). Although McGrath admittedly did not intend to develop her qualified immunity argument on appeal,[14] in her reply brief, she points us to Garner and Whitfield v. Meléndez-Rivera, 431 F.3d 1 (1st Cir. 2005), arguing a reasonable police officer in 2006 would have been aware that "it is a constitutional violation to 'seize an unarmed, nondangerous suspect by shooting him dead.'" But these cases in no way "clearly establish" that Officer Tavares's conduct was in violation of the Fourth Amendment. Mainly because the material facts in both are very different from

_____

[14] McGrath insists in her appellate brief that because the district court did not grant summary judgment on qualified immunity grounds, she does not need to establish the officers were not entitled to qualified immunity.

-20-

the ones here. Garner and Whitfield involved unarmed suspects who were shot while fleeing on foot, and who posed no immediate threat to the lives of the officers or others around them. And (as we just discussed), the record in the present case establishes Anthony did pose a significant threat of death or serious physical injury when Officer Tavares shot him. His weapon was his car, which he was driving at the police officers. Plus, and more importantly, according to Garner, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11.

The Supreme Court's discussion of qualified immunity in Plumhoff -- which involved a suspect who was killed by police amid a car chase, during which the suspect almost hit an officer with his car -- sheds more light on our particular inquiry. Referring to its 2004 decision in Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam), the Court outright confirmed that "as of February 21, 1999 . . . it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." Plumhoff, 134 S. Ct. at 2023. Brosseau, in turn, had held

> that a police officer did not violate clearly
> established law when [on February 21, 1999]
> she fired at a fleeing vehicle to prevent
> possible harm to other officers on foot who

-21-

> she believed were in the immediate area,
> occupied vehicles in the driver's path, and
> any other citizens who might be in the area.

Id. (alterations and ellipses omitted) (quoting Brosseau, 543 U.S. at 197) (internal quotation marks omitted). The Brosseau Court had deemed the reasonableness of deadly force by a police officer in response to a car chase to be "an area in which the result depends very much on the facts of each case and . . . the [then-existing caselaw] by no means clearly established that the officer's conduct violated the Fourth Amendment." Id. (citing Brosseau, 543 U.S. at 201) (alterations omitted) (internal quotation marks omitted).

On account of this, the Plumhoff Court tells us that to overcome a qualified immunity defense in a case where a police officer fired at "a fleeing driver to protect those whom his flight might endanger," a plaintiff would have to show "at a minimum" that the officer's conduct is "materially different from the conduct in Brosseau" or that between February 21, 1999, and the date of the alleged constitutional violation "there emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis of the qualified immunity question." Id. (citations omitted) (internal quotation marks omitted). McGrath cannot show either.

The facts in this case are more favorable to the shooting police officer than the facts in Brosseau. First, the police officer in Brosseau fired at the driver when he "had just begun to

-22-

flee and . . . had not yet driven his car in a dangerous manner." Id. Whereas here, Officer Tavares fired his weapon during a car chase "that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby." Id. Second, the suspect driver in Brosseau was not driving towards the police officer when the officer shot him, and thus, did not present as imminent of a threat to the police officer as in this case.

The only post-February 21, 1999 (and pre-January 10, 2006) case McGrath cites as authority for her "clearly established" argument is Whitfield, which we already addressed a few pages back. All things said, McGrath does not point us to any case since Brosseau that clearly establishes the unconstitutionality of using deadly force to end a car chase that threatened the physical safety of the police officers and others in the area.

## V. CONCLUSION

It is never easy for a parent to bury a child. And the particularly tragic circumstances surrounding sixteen-year-old Anthony's death make this loss even more devastating for his mother. However, we are duty-bound to apply the law to the record facts, which in this case do not support McGrath's theory of recovery.

Because the record does not establish a Fourth Amendment violation, and in the alternative, Defendants would be entitled to

qualified immunity, we affirm the district court's entry of summary judgment in Defendants' favor.