# United States Court of Appeals
## For the First Circuit

No. 14-2116

JONATHAN E. MITCHELL,

Plaintiff, Appellant,

v.

ROBERT MILLER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Howard, Thompson, and Barron,
Circuit Judges.

Michael J. Waxman for Jonathan E. Mitchell.
Mark E. Dunlap, with whom Norman, Hanson & DeTroy, LLC was
on brief, for Robert Miller.

June 15, 2015

**THOMPSON**, **Circuit Judge**.  We seldom do our best thinking in the murky hours when late night seeps into early morning.  What strikes one as a fine idea in the darkness may reveal itself to be a brilliant mistake in the cold light of dawn.  Decisions made well past 4 a.m. by two men -- one a suspect, the other a police officer -- are at the heart of this appeal.  Jonathan E. Mitchell, once the suspect, now the plaintiff, decided to break in to his estranged wife's apartment to talk about their relationship, and then opted to lead police on a car chase.  He now contends that Officer Robert Miller violated his Fourth Amendment rights when Miller shot him as he sped away.  The district court granted summary judgment to Miller, finding that the officer was entitled to qualified immunity.  Although Mitchell appeals that judgment, because we find the district court reached the right decision, we affirm.

## I.

### Background

On the evening of April 9, 2011 in Portland, Maine, Jonathan E. Mitchell spent time drinking at a bar and smoking marijuana before deciding to help himself to a friend's Volkswagen Jetta.  In the wee small hours of the 10th, Mitchell had the idea of visiting his estranged wife to talk "about their relationship."  Perhaps anticipating the reception he might receive, instead of

calling or ringing the bell, Mitchell broke into the sleeping woman's apartment. He then woke her and talked to her in what he characterizes as an attempt "to rekindle their relationship." Unsurprisingly, she viewed his behavior as more of a criminal act than a display of ardor, and, once Mitchell made his exit, she called the police. The woman reported the break-in at 4:39 a.m., and provided a description of the Jetta, as well as the direction in which Mitchell was driving when he left.

The police dispatcher, in turn, passed along the information to patrol officers and added that: Mitchell's driver's license had been revoked as a habitual offender; he was a sexually-violent convicted felon; and he was reported to be under the influence of alcohol or drugs and "possibly unstable." Portland Police Officer Robert Miller was on patrol that evening when he heard the report of the residential burglary, spotted the Jetta, and began to follow Mitchell. A video camera mounted to Mitchell's cruiser recorded the subsequent events.[1]

Mitchell turned into a residential neighborhood and drove at a normal rate of speed, stopping at stop signs and using

---

[1] Both Mitchell and Miller rely on the factual summary in the district court's order. The district court, in turn, relied on the videotape from Miller's cruiser, as well as that of Officer Schertz, who also responded to the radio call. Because the facts are largely undisputed, we too shall rely on the district court's recitation, and our own review of the videotapes.

his turn signal. After Miller confirmed that this was the Jetta he had been looking for, he turned on his blue lights and siren. Rather than pull over, Mitchell continued to drive at a moderate speed for over a minute. At this point, Officer David Schertz joined the pursuit in his own cruiser.

Mitchell, now tailed by two cruisers, sped up and drove down residential side streets at speeds of up to sixty-five miles per hour. After another forty seconds, Mitchell turned down a dead-end residential street and, at the end of the street, veered up onto an embankment, coming to rest three to four feet above street level. The remainder of the incident, captured on video, took only twenty-six seconds to unfold.

As Miller parked his cruiser behind the Jetta, and Schertz parked behind Miller, Mitchell began backing the Jetta down the embankment. Miller emerged from the cruiser, and Mitchell pulled the Jetta abruptly forward two to three feet before stopping. Miller approached the Jetta with his gun drawn, yelling loudly to Mitchell to get out of the car. Schertz then exited his cruiser and followed Miller. When Mitchell did not obey his commands, Miller opened the driver's side door of the Jetta with his left hand, keeping the gun pointed at Mitchell with his right. As Miller held the door, the Jetta again lurched forward. Schertz also grabbed the door of the Jetta with his left hand. Miller

- 4 -

then reached into the passenger compartment and began to grapple with Mitchell. At one point, Miller stepped back slightly and the car rolled backwards. As Miller continued to try to get hold of Mitchell, the Jetta lurched forward several feet, and its wheels turned sharply to the left. Both officers sidestepped to keep pace with the moving car.

Miller continued to tussle with Mitchell as the car once again rolled backwards. Schertz repositioned himself somewhat, moving from Miller's left and in front of the open driver's side door, to behind Miller. The Jetta's engine began to rev and its tires squealed as Mitchell threw the car into a rapid u-turn to the left (the side where the officers were standing). Miller, still holding the door, was briefly pulled around by the car, but did not fall. Miller then fired two shots in Mitchell's direction.

The Jetta sped away. Mitchell, with one bullet lodged in his shoulder (the other having passed through his neck), drove to a friend's house and ingested some opiates. He was later apprehended at the friend's house.

In April 2013, Mitchell filed suit against Miller, the city of Portland, and its chief of police. The lawsuit originally alleged four counts, two of which, against the city and the police chief, were voluntarily dismissed. As to the remaining counts, Mitchell alleged that Miller had violated his Fourth Amendment

rights, and had committed common law assault. Miller moved for summary judgment, arguing that he had used reasonable force, and that he was protected by qualified immunity. On September 26, 2014, the district court awarded summary judgment to the defendant on the grounds of qualified immunity (for the 42 U.S.C. § 1983 claim) and discretionary act immunity (for the assault claim). This appeal followed.

## II.

### Discussion

Mitchell argues that the district court erred by concluding "that Defendant Miller 'could reasonably have believed at least one other person in the immediate vicinity was in great danger,'" and by holding that Miller was entitled to qualified immunity.[2]

We review a grant of summary judgment de novo, drawing all reasonable inferences in the light most favorable to the non-moving party. Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014). Here, the inferences that can reasonably be drawn are

---

[2] Mitchell makes no separate argument regarding his state law claim and discretionary authority. Miller contends, and Mitchell does not dispute, that although the terminology differs, the standard for determining discretionary authority for the state tort claim is the same as the standard for determining qualified immunity for the federal claim, so we will address them as one. Richards v. Town of Eliot, 780 A.2d 282, 292 (Me. 2001).

limited by the existence of video evidence.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007).  We will affirm the grant of summary judgment only if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 10 (1st Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  We may affirm the grant of summary judgment on any basis apparent from the record.  Id.

A claim that a police officer used excessive force "is governed by the Fourth Amendment's 'reasonableness' standard."  Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014).  To determine whether an officer's actions were objectively reasonable, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. (internal quotation marks and citation omitted).  In so doing, we analyze the totality of the circumstances, taking the "perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight."  Id. (internal quotation marks omitted).

Even if it is not clear that the use of force was reasonable, under the doctrine of qualified immunity, a police officer is protected from liability for civil damages under § 1983 "unless it is shown that the [officer] violated a statutory or

constitutional right that was clearly established at the time of the challenged conduct." McGrath v. Tavares, 757 F.3d 20, 29 (1st Cir. 2014) (quoting Plumhoff, 134 S. Ct. at 2023). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." City and Cnty. of San Francisco, California v. Sheehan, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks and citations omitted) (alterations in original).

The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed. McGrath, 757 F.3d at 29. "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Sheehan, 135 S. Ct. at 1774 (internal quotation marks, alteration, and citation omitted) (bracket omitted). For reasons that will become clear, because we find that Miller is protected by qualified immunity, we do not reach the question of whether he used reasonable force.

**Analysis**

We "employ a two-prong analysis" to determine whether an officer is protected by qualified immunity. Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011). We first determine "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Id. If such a violation is shown, we then determine whether the law "was clearly established at the time of the defendant's alleged violation." Id. (internal quotation marks omitted).

This two-step process is not mandatory; courts have the discretion, where warranted, to proceed directly to the second prong. Pearson v. Callahan, 555 U.S. 223, 236 (2009). In fact, the Supreme Court has urged us to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (internal quotation marks and citation omitted). The district court took this approach, and we will likewise move straight to the second prong.

**1. Clearly Established**

Mitchell has the burden of demonstrating that as of April 10, 2011, the time of the alleged violation, the law was clearly established such that a reasonable officer in Miller's shoes would

be on notice that his actions would violate the Fourth Amendment. McGrath, 757 F.3d at 29. Although "[w]e do not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." Taylor v. Barkes, 575 U.S. ___, No. 14-939, slip op. at 4 (U.S. June 1, 2015) (internal quotation marks and citation omitted). To determine the state of the law as of that date, we first turn to the Supreme Court's opinion in Brosseau v. Haugen, 543 U.S. 194 (2004).

The conduct at issue in Brosseau occurred in February 1999. Id. at 200 n.4. Police Officer Brosseau responded to a fight in progress and chased one of the participants (Haugen) on foot. Id. at 196. When Haugen jumped into a parked Jeep and locked the doors, refusing to exit the vehicle, Officer Brosseau struck the Jeep's window several times with her handgun before shattering it. Id. She then reached into the car and attempted to wrest the keys from Haugen. Id. Haugen prevailed in the struggle, managing to start the Jeep and throw it into gear, driving in the direction of an occupied vehicle and forcing Brosseau to jump back. Id. Brosseau fired one shot as the Jeep drove off, hitting Haugen in the back. Id. at 196-97. Haugen filed a § 1983 action alleging that Brosseau used excessive force. Id. at 194-95. Officer Brosseau argued that she fired her gun in reasonable fear for the safety of other officers in the area,

- 10 -

passengers in the occupied vehicle, and "any other citizens who might be in the area." Id. at 197. The district court granted summary judgment to Brosseau on the grounds of qualified immunity, and the Ninth Circuit reversed. Id. at 195. The Supreme Court "express[ed] no view as to the correctness of the Court of Appeals' decision on the constitutional question," but held that the right was not clearly established, and Brosseau was entitled to qualified immunity. Id. at 198. As the Supreme Court has since instructed, "Brosseau makes plain that as of February 21, 1999 -- the date of the events at issue in that case -- it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." Plumhoff, 134 S. Ct. at 2023.

In McGrath, a more recent case involving a police officer who fired on a fleeing driver, we determined that there were two paths a plaintiff could take to avoid summary judgment under the second prong of the qualified immunity analysis: "a plaintiff would have to show at a minimum that the officer's conduct is materially different from the conduct in Brosseau or that between February 21, 1999 and the date of the alleged constitutional violation there emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis of the qualified immunity question." McGrath, 757 F.3d at 30 (quoting

- 11 -

<u>Plumhoff</u>, 134 S. Ct. at 2023) (internal quotation marks omitted). Although Mitchell argues that Miller's conduct is materially different from that of Officer Brosseau, he does not argue that either controlling authority or a robust consensus has arisen in the years since <u>Brosseau</u> that would render unreasonable a police officer's use of deadly force in a case such as this.[3] <u>See</u> <u>McGrath</u>, 757 F.3d at 30. Accordingly, our task is further narrowed and we will focus solely on whether Miller's conduct was materially different from the conduct in <u>Brosseau</u>.

### i. Materially Different

Mitchell attempts to distinguish the facts of this case from <u>Brosseau</u>, arguing that neither Miller nor anyone else was in danger of death or serious injury. There are some striking parallels between this case and <u>Brosseau</u>: both cases involve a suspect who refused to exit a vehicle; an officer with gun drawn who wrestled with the suspect for control of the car; and shots fired as the suspect drove away. Mitchell focuses his argument on the distinctions that exist between the two cases: that there was no active arrest warrant for Mitchell as there was for the suspect in <u>Brosseau</u>; that, in <u>Brosseau</u>, "the officer believed other

_____

[3] "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

- 12 -

officers were in the immediate area" of the escaping vehicle; and that, unlike Brosseau, no person or vehicle was directly in the Jetta's path. As we shall discuss, these are distinctions without a difference.

Although a warrant had not been issued for Mitchell's arrest, Miller was aware that Mitchell was a sexually-violent convicted felon suspected of breaking into his estranged wife's apartment, and that he was reported to be driving without a license while under the influence of alcohol or drugs and "possibly unstable." It is likely, therefore, that Miller and Brosseau had similar reasons for concern, and certainly more than probable cause to arrest.

Mitchell's second distinction, if correct, would be more compelling. He points out that, in Brosseau, "the officer believed other officers were in the immediate area" of the escaping vehicle. At oral argument, Mitchell's attorney distinguished this fact by stating that Officer Miller said nothing in his police report about fearing for the safety of Officer Schertz. According to counsel, that motivation surfaced for the first time during Officer Miller's deposition. Curious, we dug a little deeper. Although Mitchell did not include the police report in the record submitted to us, we found that it was attached to the deposition in the district

- 13 -

court docket.  The following is from the very end of the narrative in that report:

> Knowing the danger of a motor vehicle being driven recklessly I felt my life and Ofc. Schertz's life were in imminent danger.  At no time did Mitchell obey any of our verbal commands nor did he show any concern for our lives or the general public.  There was no question in my mind that Mitchell would have stopped at nothing to get away.

Clearly, despite counsel's representation to the contrary, Officer Miller has consistently stated that he was motivated by fear for his own life as well as that of Officer Schertz.[4]

Mitchell argues that Miller could not reasonably have believed (as Brosseau claimed to) that he or anyone else was in danger because neither the officers nor anyone else were in the path of the Jetta.[5]  However, the test is not whether a person was actually directly in the path of the car, but whether it was reasonable for Miller to believe -- at the point when events were

---

[4] "[A] genuine dispute as to a material fact cannot be created by relying on the hope that the jury will not trust the credibility of the witness.  There must be some affirmative evidence that the officer[] [is] lying.  There is none in this case, and there is nothing inherently unbelievable" about Officer Miller's testimony. McGrath v. Tavares, 757 F.3d 20, 30 n.13 (1st Cir. 2014) (internal quotation marks and citation omitted).

[5] We note that while Brosseau asserted that she acted out of fear for her fellow officers, for occupants in vehicles in Haugen's path and other citizens, the Supreme Court expressed no view as to whether her use of force was reasonable.  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

- 14 -

rapidly unfolding -- that someone was at risk of serious physical harm. Plumhoff, 134 S. Ct. at 2021 (citing Scott, 550 U.S. at 381). Both men were standing close to the Jetta at the point at which Mitchell threw the car into a rapid, tight U-turn, and Miller was still holding onto the car's door at the time. As the video reveals, although Schertz had repositioned himself shortly before the turn, Miller's focus was trained on Mitchell and he likely did not see Schertz move in his peripheral vision. Miller did not have a duty to "turn around and pin down [his partner's] exact location." McGrath, 757 F.3d at 28. We "must account for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 25-26 (internal quotation marks and citation omitted). Miller faced just such a circumstance here; the confrontation with Mitchell -- following what was at times a high-speed chase -- lasted only twenty-six seconds.

Our review of the evidence leads us to conclude that in all material ways, the facts of this case are similar to that of Brosseau, in which the Supreme Court held that it was not clearly established that the officer's conduct violated the Fourth Amendment. Because this case is not materially different from that of Brosseau, and in the absence of any subsequent contravening

- 15 -

authority, Mitchell has failed to demonstrate that it was clearly established that Miller's conduct was constitutionally unreasonable in these circumstances. We hold that Miller is protected by qualified immunity.

## III.

## Conclusion

Our de novo review reveals no genuine dispute as to any material fact, therefore Miller is entitled to judgment as a matter of law. Accordingly, we affirm the District Court's entry of summary judgment.