# United States Court of Appeals
## For the First Circuit

No. 18-1704

JOSEPH O'BRIEN,

Plaintiff, Appellant,

v.

TOWN OF BELLINGHAM, Commonwealth of Massachusetts;
RICHARD PERRY, individually and in his official capacity
as a police officer; TIMOTHY JOYCE, individually and in his
official capacity as a police officer; JAMES RUSSELL,
individually and in his official capacity as a police officer;
BRIAN KUTCHER, individually and in his official capacity
as a police officer; JOHN MELANSON, individually and in his
official capacity as a police officer,

Defendants, Appellees,

ERIC ZIMMERMAN, individually and in his official capacity as a
police officer; MICHAEL GILBOY, individually and in his official
capacity as a police officer,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Jennifer C. Boal, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Edward J. McCormick III, with whom McCormick & Maitland was on brief, for appellant.

Evan C. Ouellette, with whom Leonard H. Kesten, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellees.

---

November 22, 2019

---

**TORRUELLA**, **Circuit Judge**.  On April 9, 2012, Bellingham police officers responded to a call regarding an unresponsive and potentially intoxicated individual in the woods behind Shirley Drive in Bellingham, Massachusetts.  When the officers arrived, they came upon Joseph O'Brien ("O'Brien") laying in a shallow ravine with his pants unbuckled.  There are conflicting versions as to what occurred next, but the officers eventually placed O'Brien in handcuffs and took him to the Bellingham Police Station (the "Police Station").  There, O'Brien became increasingly irrational and violent -- destroying property, attacking and threatening the police officers, and harming himself.

Thereafter, O'Brien pleaded guilty to several state criminal charges stemming from those incidents, including assault and battery and resisting arrest.  Subsequently, O'Brien filed this civil rights suit in which he asserted excessive force claims under 42 U.S.C. § 1983 and Massachusetts state law against the police officers that apprehended him in the woods and those who attempted to subdue him at the Police Station.  After lengthy pre-trial briefing, the district court granted the officers' motion for summary judgment, holding that Heck v. Humphrey, 512 U.S. 477 (1994),[1] barred O'Brien's excessive force claims as they

---

[1]    The Supreme Court in Heck, acknowledging its "expressed . . . concerns for finality and consistency," 512 U.S. at 484-85, found that "the hoary principle that civil tort actions are not

relate to the events in the woods and some of the incidents at the Police Station. The court held that the excessive force claims arising from the events at the Police Station failed as a matter of law because the undisputed facts did not establish the use of excessive force, and in any event, that the defendants were entitled to qualified immunity. O'Brien then filed the present appeal. For the reasons that follow, we affirm.

## I. Background

**A. Factual Background[2]**

O'Brien maintains that he has no recollection of the events related to either his arrest in the woods or the post-arrest incidents in the Police Station. For his claims arising from the events in the woods, O'Brien relies on the testimony of two eyewitnesses, Bonnie Bourque ("Bourque") and Paul Nilson

---

appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement," id. at 486. As a result, it held that where a § 1983 action for damages "would necessarily imply the invalidity of" a plaintiff's conviction or sentence, such an action is not cognizable under § 1983 "unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. at 487.

[2] Because this case is being reviewed at the summary judgment stage, the factual record is presented "in the light most favorable to [O'Brien,] the nonmoving party." Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855 (1st Cir. 2008) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

-4-

("Nilson"), which we recount below. For his claims resulting from the events at the Police Station, we have the benefit of video security footage.

### 1. Events in the Woods

On April 9, 2012, Bourque -- who was inside her Shirley Drive residence in Bellingham, Massachusetts -- heard shouting in the woods behind her property. When she walked outside toward the back of her property, Bourque saw O'Brien sitting in a small ravine in the woods behind her backyard, accompanied by a younger man and a dog. Bourque asked the younger man if O'Brien needed help and whether she should call the police. The younger man informed Bourque that O'Brien's name was "Joe" and left with the dog. Though Bourque tried to talk to O'Brien, he refused to respond, he lay down, and he did not move much. Bourque went back inside and called the Bellingham Police Department.

Defendant-appellee Timothy Joyce, a Bellingham police officer ("Officer Joyce"), arrived at Bourque's door shortly thereafter. Bourque and Officer Joyce walked over to the woods behind Bourque's house, and they found O'Brien laying down on his back in the ravine with his pants undone. Officer Joyce walked over to O'Brien's left side, shook him by the shoulder, and asked him some questions, including why his pants were undone. When O'Brien stood to buckle his pants, Officer Joyce shouted at him:

"[G]et down on the ground.  Put your hands behind your back. You're under arrest."  Officer Joyce immediately yelled, "resisting arrest," pulled pepper spray out of his coat, and sprayed O'Brien in the face.  O'Brien's pants fell around his ankles, making it impossible for him to run away.  Two other Bellingham police officers, including defendant-appellee Sergeant James Russell ("Sergeant Russell"), arrived on the scene and also started pepper spraying O'Brien.  All three officers sprayed O'Brien simultaneously.  Bourque testified that O'Brien did not threaten the officers or become aggressive before they pepper sprayed him.

As the officers were spraying O'Brien, Bourque fled from the woods and ran back toward her house, stopping at her back deck, which was roughly the length of a football field away from O'Brien's location in the woods.  She did not see what was happening in the woods while she was running, but she heard O'Brien scream for "help."  From her deck, Bourque witnessed defendant-appellee Sergeant Richard Perry ("Sergeant Perry") cross through the woods from Caroline Drive towards where O'Brien and the other officers were.  At that point, a hill and a shed obfuscated Bourque's view of O'Brien and the officers.  Bourque testified that she did not see any officer strike or hit O'Brien.

Nilson, who also witnessed portions of the incident, lived on Caroline Drive on the other side of the woods from Bourque. Nilson heard a commotion and ventured into his backyard to where his property bordered the woods. From that vantage point, he saw O'Brien in the woods surrounded by police officers screaming "help, help, help." According to Nilson, the officers attempted to talk O'Brien into voluntarily being handcuffed for approximately ten to fifteen minutes, without success.

Eventually, Officer Joyce managed to get one handcuff on O'Brien's wrist while keeping the other cuff in his hand. O'Brien swung Officer Joyce around with one arm, while the other officers attempted to subdue him by striking him multiple times in the back and torso with their service batons. This had no apparent effect on O'Brien, who continued to resist by swinging his arms and swatting at the officers. According to Nilson, O'Brien continued resisting until one or two officers struck him on the head with their batons, knocking him to the ground. O'Brien finally stopped fighting, and the officers handcuffed him.

## 2. **Events at the Police Station**

After O'Brien was taken into custody, the police transported him to the Police Station for booking. The entire

incident that occurred at the Police Station was captured on video with audio.[3]

Officers brought O'Brien into the Police Station at 5:52 p.m. Simultaneously, Emergency Medical Technicians ("EMTs") from the Bellingham Fire Department, who had been summoned to treat O'Brien, arrived at the Police Station and entered the booking area. O'Brien, who was handcuffed, was immediately placed in a chair and questioned by a Bellingham firefighter/EMT regarding his medical needs.

Defendant-appellee Officer John Melanson ("Officer Melanson") uncuffed O'Brien's right hand and fastened that cuff to a long chain attached to a bar on the wall, leaving O'Brien's right hand unrestrained. The bar was located next to the door that officers used to bring detainees into the Police Station. Subsequently, O'Brien began screaming. The EMTs informed O'Brien that he would be transported to a local hospital, but O'Brien insisted on being taken to Massachusetts General Hospital in

---

[3] In the "Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment," the defendants cited to the time-stamped video recording to support their version of the events that transpired at the Police Station. O'Brien has not disputed the authenticity of the video evidence. Rather, in opposition to summary judgment, O'Brien objected to the defendants' "description and characterization of the images" without offering his own view of the contents of the video. He merely stated that "the video speaks for itself."

Boston.  O'Brien continued arguing with and cursing at the EMTs, until they eventually retreated.  Next, O'Brien cursed at the officers and threatened them with violence.  He told the officers that he would "kick the shit out of" and "beat the fuck out of" them, and he growled.  He asked the officers if they would kill him, and called them "pussies."  O'Brien continued to scream, growl, and threaten to commit graphic acts of violence against the officers.  He also told them that he had "a lot of fight left in him."

Some minutes later, O'Brien spat on the floor, growled, wiped mucus on the walls, and tore down a window covering.  He then grabbed the handset of a telephone and attempted to smash a glass window with it, while taunting the officers to shoot him.  Officer Melanson, using a baton, struck O'Brien in the leg once to stop him from breaking the window.  O'Brien squared off and swung the phone handset at the officers.  Sergeant Perry also deployed a baton.  O'Brien hit the officers, and they struck him with batons before retreating.  O'Brien continued to swing at the officers, telling them to shoot him.

Subsequently, O'Brien hit the window multiple times and picked up a metal chair, prompting Officer Melanson to pepper spray him.  Unaffected, O'Brien struck the window with the chair, then picked up a different chair, which the officers snatched from him.

He then grabbed the phone handset, swung it around, and used it to smash the glass window. O'Brien taunted, "where's your gun?" He proceeded to destroy a window blind and strike at the broken window with his uncuffed hand and arm. He told Sergeant Perry, "give me your gun," and hurled a printer across the room. Once again, O'Brien was pepper sprayed with no apparent effect.

Because the Bellingham Police Department was not equipped with tasers, Sergeant Russell called the Franklin Police Department to have an officer with a taser respond. He also called the Worcester and the Norfolk County Sheriff's departments to have a cell extraction team come to the Police Station to subdue O'Brien, but they were unable to respond.

O'Brien proceeded to hit the broken window with his uncuffed hand and arm once again, further shattering the panes. Sergeant Perry struck O'Brien's leg with a baton and ordered O'Brien to stay in the corner away from the window. Blood appeared to drip from O'Brien's hand and arm due to cuts sustained while smashing the window. O'Brien reached to his cuff and demanded that the officers give him the key to uncuff himself. Officer Joyce pepper sprayed O'Brien, who returned to the window and again hit the glass shards with his hand. Officer Melanson struck O'Brien in the torso with a baton and O'Brien swung his fist at him. Once again, Officer Joyce pepper sprayed O'Brien, who

returned to the window and tried to dislodge shards of glass. Officer Melanson again struck O'Brien with a baton and told him to back away. The struggle continued as the officers attempted unsuccessfully to control O'Brien.

Almost forty minutes after arriving at the Police Station, Franklin Police Officer defendant Eric Zimmerman ("Officer Zimmerman") arrived with a taser. The officers ordered O'Brien to get on his knees and repeatedly told him to stop resisting or he would be tased, and that he would receive the medical attention he needed if he submitted. O'Brien refused. After around twenty minutes, Officer Zimmerman deployed the taser. O'Brien called the officer a "pussy" and asked him to "give [him] another one." The officers informed O'Brien that he required medical attention and that he would be tased if he did not comply. O'Brien refused and he was tased a second time without significant effect. O'Brien told the officers that he would keep the taser barb as evidence and that he would swallow it. He then grabbed a clock off the wall and appeared to swallow the taser barb.

O'Brien asked the officers if they were going to burn down the Police Station, as "that [was their] only option." Officer Perry asked O'Brien if he was going to allow the officers to restrain him so that they could take him to the hospital, remarking that O'Brien had "bled all over the floor." O'Brien

-11-

refused and was informed that the officers were going to take the next step if he did not comply by allowing them to place handcuffs on both his hands, but he refused once again.

Subsequently, Defendant-appellee Bellingham Officer Brian Kutcher ("Officer Kutcher") positioned a tactical weapon that shot forty-millimeter rubber projectiles and asked, "are you going to comply?" Officer Kutcher commanded O'Brien to get on the ground approximately nine times, but O'Brien refused. Officer Kutcher then fired a rubber projectile. O'Brien grabbed the clock that he had previously torn off the wall from the floor and began using it as a shield. Officer Kutcher repeatedly ordered O'Brien to get down on the ground, to which O'Brien repeatedly responded, "fuck you." Officer Kutcher then fired two more projectiles. Among other statements, O'Brien shouted "you're gonna have to kill me and you're gonna have to do murder right here." O'Brien was commanded to get on the ground approximately fourteen more times, to which he continually responded, "fuck you." Kutcher fired a final rubber projectile at 7:13 p.m., with no effect. By this time, the floor around O'Brien was covered with his blood and glass from the shattered windows.

Sergeant Perry approached O'Brien to try to seize the clock, but O'Brien held it up and said, "I'll smash it right in your face." After asking O'Brien to put the clock down, Sergeant

Perry displayed a baton, causing O'Brien to swing the clock at him. In response, first Sergeant Perry and then Officer Kutcher struck O'Brien with batons, and O'Brien whacked Sergeant Perry multiple times with the clock until the officers were able to snatch the clock away from him. The officers continued to command O'Brien to get on the ground to be cuffed. Then, O'Brien began swinging the phone handset once again. Officer Kutcher commanded O'Brien to drop the phone, yet he refused and Officer Kutcher deployed a long wooden baton and, approaching O'Brien, once again commanded him to "drop the phone." O'Brien kicked at Officer Kutcher, who struck at the phone. In this scuffle, O'Brien dropped the phone handset and charged at Officer Kutcher, who struck at O'Brien and cleared the phone out of O'Brien's reach with the wooden baton before retreating.

O'Brien was told again to get on the ground so he could be cuffed and transported to a hospital to be evaluated and treated. O'Brien responded, among other things, that he was already dead. When O'Brien was told that a K-9 dog would be brought into the booking area if he did not get down on the ground, he responded, "I like dogs." Franklin Police Officer defendant Michael Gilboy ("Officer Gilboy") arrived at 7:25 p.m. holding a restrained police dog. While the dog barked at O'Brien, O'Brien approached the dog and reached out to pet it. He then told Officer

Gilboy that "your fucking dog is a pussy." Officer Gilboy eventually retreated, and the dog was never released. After approximately twenty more minutes, a mellowed O'Brien requested water, which he was quickly given. A few minutes later, O'Brien finally submitted and got on the ground. O'Brien was then handcuffed, placed on a stretcher, and taken to Milford Hospital. The entire episode lasted nearly two hours.

At the hospital, O'Brien was treated for a ketamine overdose and lacerations to his right hand that required suturing. He was also diagnosed with a mildly displaced avulsion fracture to his left wrist and nondisplaced fractures to his right wrist. As O'Brien conceded, however, "it is impossible to say with a reasonable degree of medical certainty whether" these fractures resulted from force used by any police officer or were self-inflicted by O'Brien's own actions.[4]

---

[4] We have previously held that "the commonly accepted meaning among lawyers and judges to the term 'reasonable degree of scientific certainty'" is "a standard requiring a showing that the injury was more likely than not caused by a particular stimulus, based on the general consensus of recognized [scientific] thought." Burke v. Town of Walpole, 405 F.3d 66, 91 (1st Cir. 2005) (alteration in original) (quoting Black's Law Dictionary 1294 (8th ed. 2004) (defining "reasonable medical probability" or "reasonable medical certainty," as used in tort actions)). This is consistent with the "preponderance of the evidence" standard which "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [trier of fact] of the fact's existence.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,

### 3.  Guilty Pleas as to State Criminal Charges

O'Brien pleaded guilty to the following charges arising out of his April 2012 arrest in the woods: (1) assault and battery by means of a dangerous weapon -- on Officer Joyce by means of handcuffs and on Sergeant Russell by means of a tree branch -- in violation of Mass. Gen. Laws ch. 265, § 15A(b); (2) resisting arrest in violation of Mass. Gen. Laws ch. 268, § 32B; and (3) assault and battery on a public employee as to Officer Joyce, Sergeant Russell, and Sergeant Perry, in violation of Mass. Gen. Laws ch. 265, § 13D.  O'Brien also pleaded guilty to the following charges arising out of the incident in the Police Station's booking room: (1) assault and battery by means of a dangerous weapon (a phone handset) as to Officer Melanson and Sergeant Perry, in violation of Mass. Gen. Laws ch. 265, § 15A(b); (2) malicious destruction of property valued in excess of $250 -- a window, chairs, and ceiling tiles -- in violation of Mass. Gen. Laws ch. 266, § 127; and (3) malicious destruction of property valued in excess of $250 -- a breathalyzer machine "BT" printer -- also in violation of Mass. Gen. Laws ch. 266, § 127.

As part of the plea colloquy, the Assistant District Attorney recited the following facts regarding O'Brien's arrest:

---

508 U.S. 602, 622 (1993) (quoting In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring)).

Your Honor, regarding indictment 12-0608, on October (sic) 9, 2012, the Bellingham police responded to a wooded area behind [redacted] Shirley Road in the Town of Bellingham for a reported unknown male who appeared to be sleeping in a drainage ditch and, when he was awoken, appeared to be intoxicated or under the influence of something, and he was stumbling around.

Officer Timothy Joyce initially responded, Sergeant Neil (sic) Russell shortly thereafter. They both assisted Mr. O'Brien to his feet. His speech was slurred and he was unsteady on his feet. Officer Joyce made the determination to place him into protective custody, and he conducted a pat-down search for his safety. Mr. O'Brien began to tense up and resist. Mr. O'Brien was taken to the ground and pushed himself up while police were on his back. Officer Joyce removed a switchblade pocket knife from Mr. O'Brien's right pocket and pants, and the blade was still open at this time.

During the struggle, Sergeant Russell disengaged from Mr. O'Brien and drew his OC spray. Officer Joyce continued to struggle with Mr. O'Brien and his left hand was caught in the open handcuff. As Mr. O'Brien pulled away from Officer Joyce, the officer's middle ring and little fingers twisted in the open handcuff. . . . O'Brien and Officer Joyce fell to the ground with their combined weight and landed on Officer Joyce's wrist. When Officer Joyce separated from Mr. O'Brien, the open handcuff got caught on the officer's glove and ripped the area around his wrist. It was later determined the wrist was fractured due to these actions.

Once the officers created about fifteen feet of separation and distance from Mr. O'Brien, he grabbed a tree branch and struck Sergeant Russell on the right side of his face. Sergeant Russell sprayed him with OC, which had no effect, apparently, on Mr. O'Brien, who got into a fighter's stance and closed fists and screamed that he had been waiting all his life training for something like this. Officer Joyce drew his baton and gave orders for Mr. O'Brien to get on the ground, which he refused. Both officers used a series of leg strikes to Mr. O'Brien, which had little or no effect on him. The officers requested more backup.

Sergeant Perry arrived on the scene and recognized him from the September 2, 2011 incident in which he had assaulted police. Mr. O'Brien continued to yell threats at Sergeant Perry. The three police were finally able to get Mr. O'Brien to the ground, where he continued to resist and fight. Officer John Melanson then arrived on the scene, and he and Sergeant Perry escorted Mr. O'Brien back to the Bellingham police station for booking.[5]

When asked by the court whether those facts "fairly and accurately describe[d] [his] conduct," O'Brien answered "yes." Additionally, when the judge asked O'Brien whether he understood that by pleading guilty he was "admitting to the truth of those matters that were just stated in court," he once again responded "yes." O'Brien also answered in the affirmative when the judge asked him whether he was "pleading guilty . . . because [he was] guilty[] and for no other reason," and whether he had discussed "these matters" with his attorney, including his rights, "any defenses [he] may have, and the consequences of pleading guilty." The state judge accepted O'Brien's plea for which he found that there was a factual basis.

B. **Procedural History**

On April 6, 2015, O'Brien filed suit against Sergeants Perry and Russell and Officers Joyce, Kutcher, and Melanson of the Bellingham Police Department, as well as Officers Zimmerman and

---

[5] The Assistant District Attorney also recounted the incidents at the Police Station.

Gilboy of the Franklin Police Department. O'Brien alleged that they had used excessive force and had committed assault and battery against him in apprehending him in the woods and in subduing him at the Police Station.[6] On September 11, 2015, the parties consented to the jurisdiction of a magistrate judge for all purposes. After more than two years of litigation, the parties filed a stipulation of dismissal with prejudice as to the Franklin Police Department defendants Officers Zimmerman and Gilboy.

In the weeks prior to trial -- which was scheduled to begin on April 2, 2018 -- the remaining defendants, Sergeants Perry and Russell and Officers Joyce, Kutcher, and Melanson (the "Defendants") filed various motions in limine. After reviewing those motions and O'Brien's responses, the district court determined that some issues raised were more appropriate for the summary judgment context, and that they were "for the court, not the jury, to decide." Accordingly, the district court postponed the trial and set a schedule for summary judgment briefing, directing the parties to focus on the applicability of the judicial estoppel doctrine and whether O'Brien's excessive force claims were viable in light of Heck.

---

[6] O'Brien did not claim false arrest. While O'Brien also sued the Town of Bellingham, the court granted the Town's motion to dismiss on October 14, 2015.

-18-

As ordered, the Defendants moved for summary judgment on the grounds that Heck barred O'Brien's claims and they were entitled to qualified immunity. O'Brien opposed, and additionally filed a motion to vacate the dismissal of Officers Zimmerman and Gilboy, claiming that the stipulation of dismissal for those defendants was predicated on the parties' agreement that "no motion for summary judgment would be filed." On May 30, 2018, the district court issued an order noting that the Defendants had not asserted as a basis for their motion that the undisputed facts showed no excessive force. Nonetheless, it notified O'Brien that it was considering granting summary judgment sua sponte as to the excessive force claims related to the incidents at the Police Station on the ground that, based on the undisputed facts -- i.e., the video of the incident -- no reasonable jury could find that the Defendants had used excessive force. O'Brien filed a response on June 15, 2018.

On June 1, 2018, the Defendants filed a motion to amend their answer to the complaint to add the affirmative defense of judicial estoppel, which O'Brien opposed. Subsequently, the district court heard oral arguments on the Defendants' motion to amend and O'Brien's motion to vacate. On June 21, 2018, the district court denied O'Brien's motion to vacate the dismissals of Officers Zimmerman and Gilboy.

-19-

On June 27, 2018, the district court granted the Defendants' motion to amend their answer to the complaint and their motion for summary judgment. The district court found that O'Brien's claims arising out of the episode in the woods were barred by Heck. It explained that any claim based on the premise that O'Brien was "lawfully permitted to resist arrest and/or use force to defend himself from excessive force . . . would necessarily undermine his convictions" arising from the same events. The district court also discarded any theory of liability based on Bourque's testimony that O'Brien "was attacked and pepper sprayed without provocation by the officers" as "too . . . directly inconsistent with [O'Brien's] plea in the criminal case."

Concerning the incident at the Police Station, the district court's decision was twofold. First, the district court found that Heck barred O'Brien's claims against Officer Melanson and Sergeant Perry related to the events leading up to when O'Brien struck them with the phone handset.[7] Further, the district court concluded that any claims against Officer Melanson and Sergeant Perry "past the point where they were hit by O'Brien with the phone h[andset]," or against the other defendants involved in that incident, ultimately failed as a matter of law because the

---

[7] As the district court noted, its task was complicated by the fact that O'Brien did not identify his theories of relief.

-20-

undisputed facts showed that the officers' actions were objectively reasonable and, thus, that the officers had not used excessive force.

Alternatively, the district court concluded that "the Defendants are entitled to qualified immunity in connection with any excessive force claims arising out of the events at the police station." On July 24, 2018, O'Brien filed the present appeal.

## II. Discussion

### A. Denial of O'Brien's Motion to Vacate the Stipulation of Dismissal

We need not linger over the merits of this issue as we lack jurisdiction to entertain it. The Defendants assert that O'Brien failed to comply with two jurisdictional requirements: first, that he did not file a notice of appeal within thirty days of the order's issuance, and second, that he did not reference the district court's ruling on the motion to vacate in the notice that he eventually filed. The Defendants' second point suffices to dispose of this issue.

The Federal Rules of Appellate Procedure require that a party "designate the judgment, order, or part thereof being appealed" in a notice of appeal, Fed. R. App. P. 3(c)(1)(B), and this requirement is generally characterized as jurisdictional in nature. See Smith v. Barry, 502 U.S. 244, 248 (1992). "This raises the question of whether the notice, as drafted, confers

-21-

jurisdiction upon this court to review" the challenged ruling. Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 3 (1st Cir. 2002). The Supreme Court has stated that we must construe Rule 3(c)'s specificity requirement liberally, see Barry, 502 U.S. at 248, and, therefore, "[a] mistake in designating a judgment . . . in the notice of appeal ordinarily will not result in loss of the appeal as long as the intent to appeal a specific judgment can be fairly inferred from the notice and [the] appellee is not misled by the [unclear notice]," Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.), 346 F.3d 1, 6 (1st Cir. 2003) (quoting Kelly v. United States, 789 F.2d 94, 96 n.3 (1st Cir. 1986)). In examining the notice, we consider "the appellant's intent on the record as a whole." Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 8 (1st Cir. 2005).

O'Brien's notice of appeal makes no reference to the district court's ruling on the motion to vacate the stipulation of dismissal. Rather, O'Brien stated that he was appealing "from the Court's ruling allowing the defendants' Motion for Summary Judgment entered on June 27, 2018, and the Court's Judgment dismissing the instant matter also entered on June 27, 2018, as well as any and all rulings by the Court." Neither of the two rulings specifically identified in the notice of appeal relate or refer to the ruling on the motion to vacate. Omitting the ruling

on that motion, "while, at the same time, designating . . . completely separate and independent order[s] loudly proclaims [O'Brien's] intention not to appeal," Kotler v. Am. Tobacco Co., 981 F.2d 7, 11 (1st Cir. 1992), from the ruling on the motion to vacate. Furthermore, O'Brien's inclusion of the phrase "as well as any and all rulings by the Court" in his notice of appeal does not overcome the deficiency. This language is insufficient to give notice to either the Defendants or the court of O'Brien's intent to appeal another, specific order. See id. Nor can that intent be inferred from the notice or the record, leaving us without jurisdiction to review it. Kelly, 789 F.2d at 96 n.3 (finding that the court may be flexible in entertaining an appeal even if the specific judgment that is the subject of the potential appeal is not designated in the notice of appeal so long as "the intent to appeal from a specific judgment can be fairly inferred from the notice, and [the] appellee is not misled by the mistake"); see also Barry, 502 U.S. at 248 ("Rule 3's dictates are jurisdictional in nature . . . . Although courts should construe Rule 3 liberally when determining whether it has been complied with, noncompliance is fatal to an appeal."). That ends this matter.

## B.  The Defendants' Motion to Amend Their Answer

O'Brien next challenges the district court's ruling allowing the Defendants to amend their answer to the complaint to include the affirmative defense of judicial estoppel after the close of discovery and the filing of their motion for summary judgment.

The Defendants mention, without elaborating, that O'Brien's notice of appeal "does not separately or specifically reference the ruling on the motion to amend their answer."  While this passing reference to an argument would ordinarily be insufficient to warrant our consideration, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), we pause here because of the jurisdictional ramifications.

It is true that O'Brien's notice of appeal does not specifically reference the district court's order granting the Defendants' motion to amend their answer.  Instead, it designates the Court's ruling on the motion for summary judgment and the judgment dismissing the case, both entered on June 27, 2018.  As before, we consider "the appellant's intent on the record as a whole and . . . whether the appellee has been misled by the appellant's unclear notice."  Marie, 402 F.3d at 8.  Here, we note that although O'Brien did not specifically identify the order on the Defendants' motion to amend in his notice of appeal, the

-24-

summary judgment ruling, which he did specifically include in his notice of appeal, elaborated on the district court's reasons for granting the Defendants' motion to amend, and both orders were issued on the same day. Hence, it is unlikely that the Defendants were misled "by the inartfully drafted notice of appeal." Young v. Gordon, 330 F.3d 76, 80 (1st Cir. 2003). And in any event, because the underlying controversy is easily resolved in favor of the Defendants, we need not tackle the jurisdictional issue here. See Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 27 (1st Cir. 2012) ("[W]e take shelter . . . under the familiar principle that where an appeal presents a difficult jurisdictional issue, yet the substantive merits underlying the issue are facilely resolved in favor of the party challenging jurisdiction, the jurisdictional issue may be avoided." (quoting Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1221 (1st Cir. 1990))).

To begin with, O'Brien faces a high standard of review hurdle. We review the district court's decision granting the Defendants' motion to amend their answer for abuse of discretion. Klunder v. Brown Univ., 778 F.3d 24, 34 (1st Cir. 2015). This means that a district court's order granting a motion to amend an answer to a complaint will be upheld "so long as 'the record evinces an arguably adequate basis for the court's decision.'"

Id. (quoting Juárez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 276 (1st Cir. 2013)).

Federal Rule of Civil Procedure 15(a) provides that after the time to amend "as a matter of course" has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2). According to the rule, "[t]he court should freely give leave when justice so requires."  Id.  "[W]hen a litigant seeks leave to amend after the expiration of a deadline set in a scheduling order," however, "Rule 16(b)'s more stringent good cause standard supplants Rule 15(a)'s leave freely given standard."  United States ex rel. D'Agostino v. EV3, Inc., 802 F.3d 188, 192 (1st Cir. 2015); see also Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Still, district court judges "enjoy great latitude in carrying out case-management functions."  Jones v. Winnepesaukee Realty, 990 F.2d 1, 5 (1st Cir. 1993).

As a general rule, affirmative defenses enumerated in Federal Rule of Civil Procedure 8(c), including estoppel, are "deemed waived unless raised in the answer."  Davignon v. Clemmey, 322 F.3d 1, 15 (1st Cir. 2003); see also Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any . . . affirmative defense, including . . . estoppel.").  This

-26-

Court, however, has identified exceptions to Rule 8(c)'s bar of untimely affirmative defenses, including when: (1) "the defendant asserts it without undue delay and the plaintiff is not unfairly prejudiced by any delay," or (2) "the circumstances necessary to establish entitlement to the affirmative defense did not obtain at the time the answer was filed." Davignon, 322 F.3d at 15.

O'Brien correctly asserts that the Defendants filed their motion to amend after the case-management order deadline for amending the pleadings had passed, and thus that "Rule 16(b)'s more stringent good cause standard supplant[ed] Rule 15(a)'s leave freely given standard." D'Agostino, 802 F.3d at 192. Even under the more stringent standard, however, O'Brien's contentions that the district court abused its discretion are unconvincing, as the record clearly "evinces an arguably adequate basis for the court's decision." Klunder, 778 F.3d at 34 (quoting Juárez, 708 F.3d at 276).

First, "the circumstances necessary to establish [the Defendants'] entitlement to [judicial estoppel] did not obtain at the time the answer was filed." Davignon, 322 F.3d at 15. As the Defendants pointed out, they did not receive a copy of the plea colloquy concerning O'Brien's state court convictions until after they had answered the complaint, and they did not know that O'Brien was planning to introduce facts that contradicted the basis of his

prior convictions until the deposition of certain witnesses during discovery. Moreover, by raising the judicial estoppel defense first in connection with their motion in limine and later in their motion for summary judgment, the Defendants put O'Brien on notice of the defense. And considering that the court postponed trial and set a schedule for summary judgment briefing, "in part, to give . . . the parties sufficient time for a thoughtful consideration of the issues," O'Brien had a more than adequate opportunity to address the defense. Thus, while O'Brien contends that he "suffered [from] the delay" in the Defendants' request to amend their answer, he did not explain, and we do not see, how he suffered any prejudice. In the end, O'Brien has simply not shown that the district court abused its "great latitude" over case-management functions under Rule 16(b). Jones, 990 F.2d at 5.

## C. District Court's Grant of Summary Judgment

This Court "review[s] the district court's grant of summary judgment de novo." Scholz v. Goudreau, 901 F.3d 37, 44 (1st Cir. 2018) (citing Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015)). Because we "afford plenary review to orders granting or denying summary judgment[,] . . . we 'must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in

that party's favor.'" Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

**1. *Heck* Bars O'Brien's Excessive Force Claims Arising from the Incident in the Woods**

In Heck, the Supreme Court held that when a person convicted of a crime files a § 1983 claim seeking damages for an "allegedly unconstitutional conviction" or for "other harm," the district court "must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 486-87. A plaintiff's excessive force claim and his conviction "may be so interrelated factually as to bar the § 1983 claim." Thore v. Howe, 466 F.3d 173, 180 (1st Cir. 2006). Therefore, to determine Heck's applicability, a court must examine "the relationship between the § 1983 claim and the conviction, including asking whether the plaintiff could prevail only by 'negat[ing] an element of the offense of which he [was] convicted.'" Id. at 179 (alterations in original) (quoting Heck, 512 U.S. at 486 n.6). Whether Heck bars § 1983 claims is a jurisdictional question that can be raised at any time during the pendency of litigation. See White v. Gittens, 121 F.3d 803, 806 (1st Cir. 1997); see also Henderson ex

-29-

rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011) (noting that objections to subject-matter jurisdiction "may be raised at any time").

In this case, the record reflects that O'Brien's excessive force claims arising from the incident in the woods are "so interrelated factually" with his state convictions arising from those events that a judgment in O'Brien's favor would "necessarily imply" the invalidity of those convictions. See Thore, 466 F.3d at 179–80. Indeed, if the officers had used excessive force against O'Brien while arresting him in the woods, as he now claims, their unlawful behavior would have provided O'Brien with a defense against the charges for resisting arrest and assault and battery under state law. See Commonwealth v. Moreira, 447 N.E.2d 1224, 1228 (Mass. 1983) ("[W]e conclude that where the officer uses excessive or unnecessary force to subdue the arrestee, regardless of whether the arrest is lawful or unlawful, the arrestee may defend himself by employing such force as reasonably appears to be necessary."); Commonwealth v. Graham, 818 N.E.2d 1069, 1078 (Mass. App. Ct. 2004) ("At least in circumstances where the evidence supports a claim of excessive or unnecessary force by police and the concomitant right to self-defense, we think the judge must also instruct that the Commonwealth must prove beyond a reasonable doubt that the police

did not engage in excessive force, as well as that the defendant did not act in self-defense."); <u>Commonwealth</u> v. <u>Francis</u>, 511 N.E.2d 38, 40 (Mass. App. Ct. 1987) ("Even in circumstances where the defendant would be justified in using force in lawful defense of his person against a third person, he may not do so against a police or correction officer unless the officer uses excessive or unnecessary force.").

Similarly, the district court correctly found that <u>Heck</u> bars any claim that Officer Melanson and Sergeant Perry used excessive force leading up to when O'Brien struck them with the phone handset. Granting a judgment against Officer Melanson and Sergeant Perry would have implied that O'Brien's conduct was justified, while the officers' actions were unjustified, which would have necessarily undermined the validity of O'Brien's assault and battery convictions. As we explained in <u>Thore</u>, although "[a] § 1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction . . . [,] it is not necessarily free from <u>Heck</u>" either. 466 F.3d at 180. And because O'Brien has not specified any theory of relief, let alone attempted to identify a factual scenario which would survive <u>Heck</u>, we need not go any further, as any argument to that effect is waived. <u>See</u> <u>Zannino</u>,

895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

The arguments that O'Brien does raise on appeal are confusing, conclusory, and easily discarded. First, O'Brien's assertion that the Defendants waived a defense based on Heck is unavailing as we have already noted that it is a jurisdictional issue that can be raised sua sponte by the court. See White, 121 F.3d at 806.

Next, O'Brien claims that because the Assistant District Attorney stated in the plea colloquy that the incident in the woods occurred on "October 9" rather than "April 9," the Defendants "have not furnished sufficient evidence to warrant a finding of summary judgment in their favor based on the holding in" Heck. Moreover, O'Brien avers that because his indictment does not delineate the exact locations of the crimes, it is "difficult, if not impossible," to determine whether they occurred in the woods or at the Police Station. Accordingly, O'Brien asserts, the Defendants "have not satisfied their burden to establish that the claims for excessive force are so factually interrelated so as to bar [his] §[]1983 claims."

These points are meritless. The facts set out by the Assistant District Attorney in the plea colloquy clearly and unambiguously delineate which offenses relate to which incident. Moreover, the record as a whole supports the conclusion that, in his plea colloquy, the Assistant District Attorney was referring to O'Brien's arrest by the Bellingham Police Department in the woods on April 9, 2012, even if he misspoke by saying "October" instead of "April." Crucially, O'Brien did not contest the date of the incident in response to the Defendants' statement of facts, and he did not present evidence supporting the conclusion that the Assistant District Attorney could have been referring to any other incident. Accordingly, the district court correctly granted summary judgment as to O'Brien's claims arising from the incident in the woods.

## 2. The Excessive Force Claims Arising from the Incident at the Police Station

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (citing U.S. Const. amend. IV). It follows then that excessive force claims against law enforcement officers effecting a seizure are "governed by the Fourth Amendment's 'reasonableness' standard." McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014)).

-33-

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (some internal quotation marks omitted) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). The critical question is "whether the defendant officer employed force that was unreasonable under the circumstances." Raiche, 623 F.3d at 36 (internal quotation marks omitted) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)).

"Th[e] reasonableness inquiry is an objective one; it is not a question of subjective intent." McGrath, 757 F.3d at 25 (citing Graham, 490 U.S. at 397). An assessment of reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. This evaluation must allow "for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 397. Application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of

-34-

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 396 (citing Garner, 471 U.S. at 8-9).

In this light, we conclude that the district court did not err in finding that the undisputed evidence established that the Defendants did not use excessive force against O'Brien at the Police Station.  As the district court noted, "[t]he video of the incident show[ed] that no force [was] used against O'Brien until after he start[ed] acting irrationally, cursing and threatening the officers, and trying to smash a glass window."  Moreover, it is clear that the Defendants did not "employ[] force that was unreasonable under the circumstances," given O'Brien's unpredictable and violent actions at the Police Station.  See Raiche, 623 F.3d at 36 (quoting Jennings, 499 F.3d at 11).  Thus, even viewed in the light most favorable to O'Brien, we find that the Defendants' actions at the Police Station were objectively reasonable, especially under the incident's "tense, uncertain, and rapidly evolving" circumstances.  See Graham, 490 U.S. at 397.

O'Brien counters, first, that the district court should not have relied solely on the Police Station video because deposition testimony established that summary judgment on the issue of excessive force was "simply not warranted."  On appeal,

O'Brien does not identify the deposition testimony to which he refers. Moreover, in opposition to summary judgment below, O'Brien objected to the Defendants' "description and characterization of the images" without disputing the Defendants' proposed facts with either any evidence or even by offering his own view of the contents of the video. He merely stated that "the video speaks for itself." The district court found that the Defendants' "characterizations [of the video] generally appear accurate," and so do we. In any event, we reject O'Brien's argument, because when the record contains video evidence, the authenticity of which is not challenged, the court should ordinarily view the facts "in the light depicted by the video evidence." Underwood v. Barrett, 924 F.3d 19, 20 (1st Cir. 2019) (per curiam).

O'Brien also reiterates his argument that because he "was handcuffed to a handrail, and thus could not escape, attack or physically resist at all," all the Defendants needed to do was "simply . . . leave him alone"; "[i]nstead, they chose to beat him with batons, shoot him with rubber bullets, and hit him with multiple taser barbs." We similarly reject this argument. As the district court stated, "the length of the chain attached to the bar was long enough that every time the officers retreated, O'Brien responded by attempting to use items in the booking room as weapons

or by destroying property."  Moreover, O'Brien's argument ignores that he "attempted to escape from the handcuffs on several occasions," that he "was causing a major security issue," and that he "was bleeding profusely from injuries he appear[ed] to have sustained from breaking a glass window and the officers needed to subdue him in order to transport him for medical attention."

Finally, O'Brien avers that he voluntarily complied after the officers gave him a glass of water and talked to him. Yet the video reflects that the officers spoke to O'Brien rationally many times before and that they made numerous prior verbal attempts to calm him down throughout the two-hour ordeal, with no success.  The officers even appeared to minimize the amount of force they used.  For example, they fired the rubber bullets only sparingly and withheld the K-9 dog.  Thus, we conclude that even when viewed in the light most favorable to O'Brien, based on the undisputed facts, no reasonable jury could find that the officers' actions were unreasonable under the circumstances. Accordingly, the district court did not err in entering summary judgment against O'Brien on his excessive force claims arising from the incident at the Police Station.[8]

---

[8]  Because O'Brien's excessive force claims fail as a matter of law, we need not decide whether the Defendants were entitled to qualified immunity.

### 3.  **State Law Claims**

Because O'Brien makes no argument regarding the dismissal of his state law claims, any such argument is waived. Zannino, 895 F.2d at 17.

## III.  **Conclusion**

For the foregoing reasons, we affirm.

**Affirmed.**