# United States Court of Appeals
## For the First Circuit

No. 20-1103

MICHAEL E. LACHANCE,

Plaintiff, Appellant,

v.

TOWN OF CHARLTON; OFFICER JASON F. WHITE; OFFICER TIMOTHY A.
SMITH; SGT. KEITH R. CLOUTIER,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Katzmann, Judge.[*]

Héctor E. Piñeiro, with whom Robert A. Scott, Lizabel M.
Negrón-Vargas, and Law Office of Héctor Piñeiro were on brief, for
appellant.
Bradford N. Louison, with whom Douglas I. Louison and Louison,
Costello, Condon & Pfaff, LLP were on brief, for appellees.

March 3, 2021

---

[*] Of the United States Court of International Trade, sitting
by designation.

HOWARD, **Chief Judge**. Michael Lachance ("Lachance") woke up at night gasping for air. His wife called 911, and three police officers responded. Lachance did not appear to be of sound mind. While attempting to restrain him, two officers ended up pushing Lachance onto a sofa-recliner (the "push"), which toppled over, then one of the officers kneeled on his back (the "kneel"). Lachance sued the officers, Sgt. Keith Cloutier, Officer Timothy Smith, and Officer Jason White, and their employer, the Town of Charlton, Massachusetts ("defendants"). The district court found at summary judgment that the push and the kneel constituted two discrete uses of force and granted summary judgment to the defendants as to the push on the basis of qualified immunity. After a jury trial, the court entered a directed verdict for the defendants on the remaining counts on the ground that Lachance failed to prove that any injury he suffered was caused by the kneel. We affirm in part and vacate in part.

**I.**

**A.**

In the middle of the night on January 4, 2014, Kimberley Lachance awoke to her bed shaking and a gurgling sound.[1] She noticed her husband, Lachance, convulsing, gasping for air, and

---

[1] We take the facts in this section from the submissions at summary judgment and present them in the light most favorable to Lachance as the non-moving party. See Zabala-De Jesus v. Sanofi-Aventis P.R., Inc., 959 F.3d 423, 427-28 (1st Cir. 2020).

foaming at the mouth beside her. Mrs. Lachance attempted to supply him with his inhaler, but he rolled off the bed, landing face-down onto the floor. Somewhere along the way, Lachance bit his tongue and started bleeding from his mouth. When Mrs. Lachance noticed that he had urinated on himself and his complexion was turning blue, she called 911.

Officer Smith responded to the call and attempted to assess Lachance and supply him with oxygen, but Lachance got up and started stumbling down the hallway, pressing his hands against the walls for support and wearing only his underpants. By this time, Sgt. Cloutier and Officer White as well as two EMTs had arrived. All three police officers were aware that Lachance was experiencing some sort of medical emergency, but no one present at that time had deduced what was causing his symptoms. Lachance pushed past the EMTs who were in his way, ignoring their questions about his condition and their requests that he stop moving and repeatedly asking, "What did I do?"

Officers Smith and White officers flanked Lachance, each holding one of his arms, and repeatedly told him to stop walking. But Lachance continued walking, attempting to pull away from the officers and repeatedly asking what he did. He began to "wobbl[e]" and "stumble[]" his way toward the open kitchen door leading to a steep, icy stairway outside the second-story apartment, but the

- 3 -

officers redirected him toward a cloth La-Z-Boy recliner in the adjacent living room.

According to Mrs. Lachance, the two officers then pushed Lachance onto the sofa-recliner "with a lot of force"; he landed in a seated position; the recliner tumbled over backward along with Lachance and the officers, one of whom landed on top of Lachance; and Lachance landed with his back on the recliner, still in a seated position. Lachance's son Amahd, who witnessed the encounter from his bedroom doorway, described the force used as "a push, grab, follow through." He described his father's fall onto the recliner as a "hard landing," "not the way that you would want to sit in it" but rather "more like he fell on the top of it." Amahd further described Lachance's subsequent fall onto the floor as another "hard landing" on his "back side-ish" and "shoulder blade" area, his body "laying on the ground" with the upper half on the kitchen's tile floor and the lower half on the living room's hardwood floor.

"Immediately" after his fall, the officers "swarmed" Lachance. Officers Smith and White got up, grabbed one of Lachance's arms each, and dragged him off the recliner and onto the kitchen floor behind it. Lachance began flailing his arms and kicking his legs, screaming for his mother, and asking what he did wrong. The three officers forcibly rolled Lachance onto his stomach. Sgt. Cloutier and Officer White moved next to his upper

- 4 -

body, and Officer Smith straddled his legs. Lachance kept trying to get up, so one of the officers kneeled down with one knee on the center of his back to keep him down. Officer White placed a pillow under Lachance's head to stop him from banging it on the floor, Officer Smith put his legs in a figure-four leglock, and some combination of the officers pulled his arms behind his back and attempted to place handcuffs on him. While Lachance was on the floor, Mrs. Lachance noticed bruising on his back, and Amahd heard someone yell that he was seizing.

The on-the-floor scuffle between Lachance and the officers was over in a matter of seconds. Sgt. Cloutier and Officer Smith ended up placing one set of handcuffs on one of Lachance's hands and one on the other and then connecting the two. EMTs brought a stretcher into the room, rolled Lachance onto it, then strapped him in. Lachance was transported to the University of Massachusetts Medical Center. Throughout the twenty-minute ambulance ride, he was kicking and thrashing about, so much so that he cut his wrists open. When Amahd arrived at the hospital to visit his father, he noticed deep cuts on his father's wrists and bruising all over his back, ribs, and shoulders. Lachance was diagnosed with cluster seizures and a T4-T5 compression fracture. He suffered back pain for over a year after the incident.

**B.**

At trial, Amahd testified that the kneel was to the center of Lachance's back, and Mrs. Lachance specified that the kneel was to the center of Lachance's upper back.[2] Mrs. Lachance further testified that the kneel lasted no more than thirty seconds.

Lachance's medical expert, Alexander Chirkov, MD, opined to a reasonable degree of medical certainty that Lachance's T4-T5 compression fracture was caused by him being pushed onto the recliner and not from any subsequent kneeling. In a transparent but confusing effort to illustrate why he reached that conclusion, he testified about a photograph of a bruise on the left side of Lachance's back and indicated that when one considers the "direction" "[o]f the force when the person lay[s] down on the ground," it would have been "impossible to generate . . . [enough] compression to smash the vertebrae." Dr. Chirkov did, however, note that while any kneeling on the T4-T5 discs was "not . . . going to accelerate the fracture," it "can make the problem worse" by causing "more compression of the nerves" and therefore "more pain."

---

[2] We take the facts in this section from the evidence offered at the jury trial and again present them in the light most favorable to Lachance. See Hernandez-Cuevas v. Taylor, 836 F.3d 116, 119 (1st Cir. 2016).

Dr. Chirkov testified about a number of other photographs documenting Lachance's injuries. In relevant part, Dr. Chirkov testified about a photograph of Lachance's upper back, indicating two bruises and attributing them to "pressure on his back, physical compression" of the sort "usually . . . see[n] . . . on restrained people." He further testified about a photograph showing a brown bruise on Lachance's midline, which was "consistent with a compression mark" and "[a] restrained position." In the end, he clarified that he found no injuries that Lachance suffered other than the T4-T5 compression fracture to be "of significance."

### C.

Lachance filed a complaint in the District Court for the District of Massachusetts, alleging excessive force pursuant to 42 U.S.C. § 1983 (Count I), assault and battery (Count II), a claim under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), against the Town of Charlton (Count III), negligence (Count IV), and violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 (Count V).

The defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The district court granted the defendants' motion as to the excessive force claim insofar as it was premised on the push, as well as the ADA claim, but it denied summary judgment on the remaining counts and expressed its intention to bifurcate trial of the Monell claim from trial of the

- 7 -

other claims.  The case proceeded to trial by jury on what remained of the excessive force claim as well as the state law assault and battery and negligence claims.  At the close of trial, the defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on those three claims.  The court granted the motion as to all remaining claims, including the Monell claim for which the defendants had not moved for judgment as a matter of law, and entered a directed verdict for the defendants.

This timely appeal followed.  We have jurisdiction under 28 U.S.C. § 1291.

**II.**

On appeal, Lachance challenges the district court's orders: (1) granting the defendants' motion for summary judgment on the excessive force claim as to the push; and (2) granting the defendants' motion for judgment as a matter of law on the remaining four counts.[3]  We address each challenge in turn.

**A.**

We review a district court's grant of summary judgment de novo, reading the facts in the light most favorable to the non-

---

[3] Lachance does not challenge the district court's order granting the defendants' motion for summary judgment on the ADA claim.  Therefore, we do not address it.

- 8 -

moving party and granting all reasonable inferences in his favor. See Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020).

Qualified immunity is a doctrine that shields government officials from individual-capacity suits for damages under § 1983 "when [they] ma[de] a decision that, even if constitutionally deficient, reasonably misapprehend[ed] the law governing the circumstances [they] confronted." Taylor v. Riojas, 141 S. Ct. 52, 53 (2020) (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)). Thus, police officers are immune from such suits unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Irish, 979 F.3d at 76 (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)).

Because "[e]xcessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person," such claims are "governed by the Fourth Amendment's reasonableness standard." O'Brien v. Town of Bellingham, 943 F.3d 514, 530 (1st Cir. 2019) (internal quotation marks and citations omitted). "Determining whether a particular use of force is reasonable requires consideration of the totality of the circumstances," including (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight"

(the "Graham factors"). Gray v. Cummings, 917 F.3d 1, 8 (1st Cir. 2019) (alterations in original) (second quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). This assessment of reasonableness "must be judged from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396.

"The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed." Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015). In determining whether the unlawfulness of officers' conduct was clearly established, "the salient question . . . is whether the state of the law [at the time of the officers' conduct] gave [them] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Irish, 979 F.3d at 76 (alterations and omission in original) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). The answer to that question is "yes" when: (1) the law was "clear enough that every reasonable official would [have] interpret[ed] it to establish the particular rule the plaintiff seeks to apply"; and (2) "[t]he rule's contours [were] so well defined that it [would have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (third and fourth alterations in original) (quoting Wesby, 138 S. Ct. at 590). The rule establishing the conduct's illegality must be "dictated by [either] 'controlling authority' or 'a robust consensus of cases

- 10 -

of persuasive authority,'" the latter of which "does not require the express agreement of every circuit" but rather some sister circuit law can suffice. Id. (first quoting Wesby, 138 S. Ct. at 589-90).

In the Fourth Amendment context, the "[s]pecificity" of the rule set forth in such precedent "is especially important," because it can be "difficult for an officer to determine how the relevant legal doctrine," such as excessive force, "will apply to the factual situation the officer confronts." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)). Of course, prior cases with materially similar facts are not necessary to clearly establish conduct's illegality; a "general constitutional rule" located in prior authority can suffice to defeat qualified immunity even in "novel factual circumstances." Hope, 536 U.S. at 741 (internal quotation marks and citations omitted). But that is true only in an "obvious case," Brosseau, 543 U.S. at 199, where "any reasonable officer should have realized that [the conduct at issue] offended the Constitution," Riojas, 141 S. Ct. at 54. As such, "relevant case law," where "an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," is "usually necessary" to overcome officers' qualified immunity. Wesby, 138 S. Ct. at 590 (first and second internal quotation marks and citations omitted).

With these principles in mind, we turn to the district court's summary judgment opinion. The court granted summary judgment in favor of the defendants on Lachance's excessive force claim insofar as it was premised on the push, on the basis of qualified immunity. It applied the two-part test for qualified immunity as articulated above, considering first whether the officers' conduct violated Lachance's constitutional rights and next whether those rights were clearly established at the time. In doing so, the court severed its analysis of the push from the kneel. The court noted that in Jennings v. Jones, 499 F.3d 2 (1st Cir. 2007), and Rush v. City of Lansing, 644 Fed. App'x 415 (6th Cir. 2016), both this Court and the Sixth Circuit applied a similarly "segmented" approach in considering whether qualified immunity applied to certain uses of force but not others in an encounter. The court reconciled our seemingly contradictory approach in Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995), on the ground that each discrete use of force in that case was arguably independently excessive.

The district court next considered the factors relevant to whether a use of force was unreasonable in violation of the Fourth Amendment, as set forth in Graham. It found that "[a] reasonable juror could conclude that throwing a person -- who is not suspected of committing a crime or a threat to officers -- over a sofa with enough force to break his back, and then using

- 12 -

the dangerous restraint technique of kneeling on his back, is an excessive use of force." Although it is not apparent from the court's wording here, the court proceeded on the understanding that the push and the kneel were two independent excessive uses of force, as opposed to one combined excessive use of force. Indeed, the court clearly assumed without deciding that the push was unreasonable by taking it as a given that the officers "used a lot of force," notwithstanding its dicta that even on that assumption, the push "may have been a reasonable use of force."[4] It separately concluded that "kneeling on the back of a restrained person is unreasonable," and that the kneel, under Lachance's version of events, "was excessive."[5]

The district court then found that "it was clearly established that [Lachance] had a constitutional right to be free from an officer kneeling on his back after he had been restrained,"

---

[4] In explaining why the push may have been reasonable despite its conclusion that the kneel was not, the district court distinguished its approach from that of Rasmussen v. City of New York, 766 F. Supp. 2d 399 (E.D.N.Y. 2011). In that case, the court noted, the initial use of force was deemed to be excessive under Rasmussen's version of the facts and therefore informed the assessment of whether the subsequent use of force was excessive, id. at 405-06, whereas here the court held only that the subsequent use of force -- the kneel -- was undoubtedly excessive in Lachance's telling of events.

[5] Although these findings came in the context of the district court's analysis of whether Lachance's rights were clearly established, they plainly concern whether there was even a constitutional violation in the first instance. See O'Brien v. Town of Bellingham, 943 F.3d 514, 530-31 (1st Cir. 2019).

but that there were fact issues that bore on whether a reasonable officer would have understood that his conduct violated that right, namely whether an officer kneeled on Lachance's back at all and, if so, for how long. However, the court found that it was not clearly established that the push, even assuming it was carried out with a lot of force, violated the Constitution under the circumstances. The court noted that Lachance failed to point to any controlling or persuasive case law to show that his right to be free from such force was clearly established, although the court identified one out-of-circuit case that might support his position (citing Smith v. City of Troy, 874 F.3d 938 (6th Cir. 2017)). In fact, the court added, in-circuit case law "suggests that forcefully pushing a resistant plaintiff to the ground is not excessive" (comparing Therrien v. Town of Jay, 483 F. Supp. 2d 19, 26-27 (D. Me. 2007), with Ciolino v. Gikas, 861 F.3d 296, 303-06 (1st Cir. 2017); Jacobson v. City of Nashua, 2002 WL 1349515, at *4 (D.N.H. June 19, 2002)).

Lachance argues that the district court erred by segmenting its analysis of the push and the kneel. Then, assuming arguendo that the push could be severed from the kneel, Lachance cites the general rule in Graham and a series of purportedly factually analogous cases to show that it was clearly established

- 14 -

at the time that the push was a violation of his Fourth Amendment right to be free from the use of excessive force against him.[6]

The defendants respond that the district court properly segmented its analysis of the push and the kneel, largely restating the court's reasoning.  They argue that the push did not violate Lachance's clearly established rights, asserting that we held for the first time in 2019, years after the incident, that "a jury could supportably find that the use of a Taser to quell a non-violent, mentally ill person who is resisting arrest to be excessive force."[7]  Gray, 917 F.3d at 20.

---

[6] Additionally, Lachance confusingly asserts that the district court "deprived [him] of the facts of his case at summary judgment" and cursorily asserts that the court "picked and chose arbitrarily which scenario it found more persuasive, including issues of causation, proximate cause and damages."  Whatever arguments can be gleaned from these statements, they fail for lack of development and we do not address them.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[7] The defendants also argue that we should adopt the Sixth Circuit's excessive-force framework in cases of medical emergencies as set forth in Estate of Hill by Hill v. Miracle, 853 F.3d 306, 314 (6th Cir. 2017), and that under that framework, the push was not excessive because it was reasonably necessary to protect Lachance and the EMTs.  We need not reach this alternative ground for affirming the district court's decision because even if the push was excessive, it was not clearly established that it was.

- 15 -

**1.**

There may be some tension in our cases about how to analyze multiple-force scenarios.[8]  In Jennings, we noted that an officer who used an "ankle turn control technique" to subdue an initially resistant suspect would arguably reasonably have "believe[d] that it was lawful to maintain the level of force he used even after [the suspect] ceased resisting," but that "an objectively reasonable officer in [the officer's] circumstances would not have believed that it was lawful to increase the amount of force that he used after [the suspect] ceased resisting and stated that [the officer] was hurting him."  499 F.3d at 4, 19. Our reasoning in Jennings was thus indicative of a segmented approach, namely between a decision -- at the moment that Jennings stopped resisting -- to maintain the level of force applied in utilizing the ankle turn control technique or to increase the amount of force applied in utilizing that technique.

_____

[8] We use "multiple-force scenarios" for simplicity's sake, but we acknowledge that it is something of a misnomer.  Certainly, a change in the type or degree of force used, or a pause in which no force is used, are each indicative of distinct uses of force that might best be analyzed separately.  But one could imagine scenarios in which the same type and degree of force is used continuously such that it manifests as a singular use of force, yet a segmented approach is still warranted because that force at some point may have crossed the threshold from the reasonable to the unreasonable.  Consider, for example, the use of a chokehold to restrain a violent suspect, but then continuing to use the chokehold long after the suspect appeared to lose consciousness. Nevertheless, because Lachance has conceded that the push and the kneel were separate uses of force, we need not dwell on this point.

Whereas previously in Alexis, we considered the following set of facts in relation to an excessive force claim:

> Alexis was told by [an officer] that she was being placed under arrest. Then, without asking or directing Alexis to get up from the table, [that officer] suddenly and violently grabbed and pulled her bodily from the booth and across the table, handcuffed her hands tightly behind her back, and, with the help of [another officer], dragged her from the booth, bruising her legs in the process. Insisting that she was "not resisting arrest," Alexis asked the officers to allow her to walk out. Instead, they hoisted her by her elbows and carried her from the restaurant to the police car, where [the first officer] pushed her into the car with the instruction, "Get your ass in there."

67 F.3d at 346. Applying the three factors enumerated in Graham, we reversed the district court's grant of summary judgment on the basis that the record compelled the conclusion that the force used was reasonable under the circumstances, holding that a reasonable jury could find that "the force with which [the first officer] effected the sudden, unannounced, violent seizure and removal of [the plaintiff]'s person" was unreasonable, "especially since there [was] no evidence or suggestion that she posed a risk of flight, attempted to resist or evade arrest, or threatened the peace, property or safety of anyone." Id. at 353.

One might look at our reasoning in Alexis and conclude, from our use of the word "force" in its singular form and the manner in which we adjudged the officers' actions, that we considered them as one all-encompassing use of force. But looks can be deceiving. In that same opinion, we noted that "all the

surrounding circumstances, individually and in combination, plainly counseled minimal force in effecting any arrest," and we strongly implied that such minimal force was not used at any step of the way toward effecting the seizure, when Alexis "was abruptly pulled from the booth, and across the table, with sufficient force to bruise her legs, then handcuffed with her hands behind her back and dragged and carried to a police cruiser and pushed inside." Id. Thus, as the district court astutely observed and as Lachance has conceded, our decision in Alexis is at least as consistent with a segmented approach as it is with a holistic one, in that each use of force was arguably unreasonable.

We have found no circuit that is completely averse to applying a segmented approach where it makes sense. See, e.g., Wright v. City of Euclid, 962 F.3d 852, 865 (6th Cir. 2020) ("[W]hen . . . a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'") (quoting Smith v. City of Troy, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)); Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1172-74, 1175-77 (10th Cir. 2020) (finding no clearly established law that shooting the decedent while he fled was unreasonable, but finding such law with respect to subsequently shooting him on the ground); Jackson v. Stair, 944 F.3d 704, 712, 714 (8th Cir. 2019)

(holding that the district court erred by ruling that the officer's conduct "as a whole" was reasonable without considering whether each of the three tasings "could be a constitutional violation on its own") (citing Blazek v. City of Iowa City, 761 F.3d 920, 925 (8th Cir. 2014)); Harris v. Pittman, 927 F.3d 266, 268-69 (4th Cir. 2019) ("[E]ven where an initial use of deadly force is reasonable, the repeated use of force may be constitutionally excessive if circumstances change in a material way.") (citing Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005)), cert. denied, 140 S. Ct. 1550 (2020); Horton v. Pobjecky, 883 F.3d 941, 950 (7th Cir. 2018) ("Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment.") (citing Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993)); Mills v. Fenger, 216 F. App'x 7, 8-10 (2d Cir. 2006) (considering plaintiff's claim that "officers used excessive force at three separate points during his arrest," id. at 8, and holding that there were fact issues whether the first and second uses were reasonable, but not so the third).[9]

---

[9] There are some cases in the Fourth Circuit that might appear to reject segmentation. See, e.g., Livingston v. Kehagias, 803 F. App'x 673, 686 (4th Cir. 2020) (rejecting the defendant officers' "element by element or moment by moment" view of the facts for purposes of qualified immunity and instead considering whether "the force used as a whole," or "the cumulative force deployed,"

- 19 -

It seems to us that the segmented approach is also consistent with Supreme Court precedent. In Graham, the Court made clear that the reasonableness of a use of force is to be determined "at the moment" that the force was applied. 490 U.S. at 396. It explicated that the reasonableness inquiry depends on "the facts and circumstances confronting" the officer in "a

was reasonable) (citing Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)); Yates v. Terry, 817 F.3d 877, 883 (4th Cir. 2016) (faulting the district court's individualized consideration of three tasings of the plaintiff and adding that it had "cautioned courts against using 'a segmented view of the sequence of events' where 'each distinct act of force becomes reasonable given what [the officer] knew at each point in th[e] progression'" (alterations in original) (quoting Rowland, 41 F.3d at 173)). But each of these cases hinged on Rowland for their rejection of the segmented approach, and that case rejected not "the notion that the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds," but rather "the idea that any of the events should be reviewed outside the context of the conduct that precipitated the seizure." Waterman, 393 F.3d at 481; see also Smith v. Ray, 781 F.3d 95, 102 n.4 (4th Cir. 2015) (noting that Waterman "explained" where segmentation is appropriate and where it is not).

Thus, those few Fourth Circuit cases that have declined to apply segmentation were typically such that whether segmented or not, each use of force was arguably unreasonable because the Graham factors remained relatively constant throughout the encounter and weighed heavily against the officer(s). See, e.g., Livingston, 803 F. App'x at 684 (noting that "the officers were faced with an individual who had committed, at most, minor offenses; did not attempt to attack the officers; was not and did not appear to be armed; and offered no resistance until after he was suddenly brought to the ground, and only passive resistance after that"); Yates, 817 F.3d at 885-86 (noting that the plaintiff at most committed "minor traffic infractions," was not a danger to the officer "at any time during their encounter," and "was not attempting to flee or resist"). In many ways, then, these cases resemble our decision in Alexis.

- 20 -

particular situation," which facts and circumstances are "often

. . . tense, uncertain, and rapidly evolving." Id. at 397.  Put

differently, "[e]xcessive force claims . . . are evaluated for

objective reasonableness based upon the information the officers

had when the conduct occurred."  Cnty. of Los Angeles v. Mendez,

137 S. Ct. 1539, 1546-47 (2017) (omission in original) (quoting

Saucier v. Katz, 533 U.S. 194, 207 (2001)).  Such language seems

to favor a segmented approach, at least when circumstances relevant

to the reasonableness inquiry changed between one use of force and

another.[10]  After all, if the reasonableness of an officer's use

of force depends on the information available to that officer under

a  particular  set  of  circumstances,  which  appear  to  have

---

[10] This does not mean that a segmented approach could not be deployed even if all relevant circumstances are held constant throughout.  It would simply be a waste of ink and time.  For example, if an officer reasonably would have believed that a suspect was completely incapacitated and yet proceeded to beat, then tase, then shoot him anyway, then a court need not proceed seriatim through each of the three uses of force and explain why they were unreasonable and why such was clearly established; the uses of force were individually and collectively unlawful.  This is consistent with our approach in Alexis and with the Fourth Circuit's cases discussed supra note 9.

Nor does this mean that after segmenting the uses of force and assessing each as reasonable, a court could not thereafter look at the totality of the uses of force, see Graham, 490 U.S. at 396; Alexis, 67 F.3d at 353 (looking at "combination" of segments), and determine that there was a constitutional violation, see, e.g., Yates, 817 F.3d at 883.

meaningfully changed between one use of force and another, then it only makes sense to consider those uses separately.[11]

Here, there was clearly a change in circumstances between the push and the kneel that was relevant to the reasonableness inquiry. Before the push, Lachance was still standing and actively attempting to make his way outside, and he had been resisting the officers' efforts to stop him by issuing instructions, grabbing his arms, and redirecting him. After the push, Lachance was on the floor with visible bruising on his back and, although he was flailing his arms and legs, may have been attempting simply to stand up (as opposed to going outside) when an officer kneeled on his back to keep him down. On these facts, it made sense for the district court to segment its analysis.

---

[11] This does not mean that the officers' actions or inactions leading up to the moment in question cannot be considered, and in fact they should be considered as part of the "totality of the circumstances" in determining reasonableness. See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 22 (1st Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)); but see Mendez, 137 S. Ct. at 1547 n.* (declining to consider whether as part of the "totality of the circumstances" inquiry it is appropriate to account for "unreasonable police conduct prior to the use of force that foreseeably created the need to use it" (quoting Graham, 490 U.S. at 396)). Nor does it mean that a plaintiff could not recover for injury immediately caused by a reasonable use of force, which in turn was proximately caused by events set in motion by a prior unreasonable use of force. Cf. Mendez, 137 S. Ct. at 1548. These considerations do not factor in here, however, because Lachance is effectively arguing that a subsequent use of force -- the kneel -- should retroactively taint a prior use of force -- the push.

Lachance himself conceded at oral argument that there are times when a segmented approach makes the most sense, and he conceded in his opening brief that the push and the kneel were two distinct "uses of force" and that our rulings in Jennings and Alexis are consistent with a segmented approach. His only real arguments against a segmented approach are that the push and the kneel occurred during the course of a "single transaction occurring in a brief period" and that we did not use the word "segmented" in Jennings and Alexis. Lachance otherwise summarizes without exegesis the Sixth Circuit's ruling in Rush and conclusorily asserts that "neither the fact pattern, First Circuit case law, cases cited by the District Court, nor the interests of justice required the District Court to apply the fractured or segmented qualified immunity analysis that it did." If there were grounds to find error with the district court's segmented approach, we have found none and Lachance has not pointed to any.

**2.**

Proceeding to analyze the push separately from the kneel, we conclude that the push was not a clearly established violation of Lachance's right to be free of unreasonable seizures. Lachance argues that the Graham factors are lopsided in his favor and that this is sufficient to show that his right was clearly established. But it is well-established that the Graham factors, while instructive, are not exhaustive of the totality of the

- 23 -

circumstances that must be considered in each excessive force case. See Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). Moreover, the Graham test is geared toward criminal suspects as opposed to persons who are suspected only of experiencing a medical emergency for which they require aid. See Estate of Hill by Hill v. Miracle, 853 F.3d 306, 313 (6th Cir. 2017). Still, we briefly consider how the Graham factors apply to the facts of this case.

Here, it was undisputed that Lachance was struggling to walk; that he seemed intent on making his way outside the kitchen door of his second-story apartment, where a steep, icy staircase awaited him; and that the officers' actions were geared toward preventing him from doing so. On these facts, we cannot say that Graham was instructive enough on its own to have provided "fair warning" to the defendant officers in this case that the push was unreasonable. Hope, 536 U.S. at 741; see also Graham, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal quotation marks and citation omitted)). Certainly, this was not an "obvious case" where the officers so blatantly violated the Fourth Amendment that recourse to factually analogous case law is unnecessary. Wesby, 138 S. Ct. at 590 (quoting Brosseau, 543 U.S. at 199).

To that end, Lachance cites a number of purportedly factually analogous cases, but none are materially similar enough

to have provided reasonable officers under the circumstances with fair warning that they would violate Lachance's rights by pushing him in the manner that the defendant officers did. He cites as controlling authority our decision in Ciolino, 861 F.3d 296, but that decision could not have clearly established his right as of the date of the push in January 2014. See Kisela, 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious."). The same is true of most of the decisions that Lachance relies on. See Smith, 874 F.3d 938; Taylor v. Moore, 383 F. Supp. 3d 91 (D. Mass. 2019); Guthrie v. Guthrie, 216 F. Supp. 3d 590 (W.D. Pa. 2016); Barcomb v. Kraeger, 2016 WL 2644885 (D. Conn. May 5, 2016); Lynn v. City of Indianapolis, 2014 WL 3535554 (S.D. Ind. July 16, 2014). Although a plaintiff may rely on cases published after the date of his incident where the cases reiterate or summarize clearly established law at the time of the plaintiff's incident, see Brosseau, 543 U.S. at 200 (assessing whether "at the time of [defendant's] actions," there was clearly established law), none of these cases Lachance cites address clearly established law in January 2014 related to the push.

Lachance cites just four decisions that predate the police officers' conduct in this case: Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010); Morelli v. Webster, 552 F.3d 12 (1st Cir.

- 25 -

2009); Alexis, 67 F.3d 341; and Fera v. City of Albany, 568 F. Supp. 2d 248 (N.D.N.Y. 2008). We briefly summarize the facts of each case, which were depicted in the light most favorable to the plaintiffs. Raiche was driving a motorcycle without a helmet, so two police officers signaled him to pull over; he did not immediately stop; and when he did, one of the officers immediately ran over and tackled him, causing his head to hit the pavement and the motorcycle to fall on his leg. 623 F.3d at 33-34. In affirming the denial of qualified immunity to the officer, we noted that Raiche displayed no inclination to resist or flee, id. at 37, and "present[ed] no indications of dangerousness," id. at 39. Similarly, Morelli was suspected only of the theft of $20 and had shown no "evidence of either dangerousness or attempted flight" when a police officer yanked her arm and pinned her against a wall for three to four minutes with sufficient force to tear her rotator cuff. 552 F.3d at 24. We therefore upheld the denial of qualified immunity to the officer. Id. at 25.

We have already discussed in detail Alexis's experience, but we recount that she was suspected only of criminal trespass, did not "pose[] a threat to . . . anyone," and never "attempted to evade or resist arrest." 67 F.3d at 353. Finally, Fera suffered a seizure in a government building, and officers arrested her when she refused orders to leave; the officers ignored numerous signs that she was epileptic and her express warning that she was about

to suffer another seizure; they placed her in the back of a police van alone and handcuffed, where a seizure immobilized her; and then they pulled her unresponsive body from the van by the ankles in such a way that her face repeatedly bounced off its floor. 568 F. Supp. 2d at 251-52. On those facts, the District Court for the Northern District of New York denied qualified immunity. Id. at 253-57.

All four cases are readily distinguishable from the instant one. Most notably, in each of those cases, the plaintiff did not pose a discernable risk to anyone. Here, Lachance posed a risk of serious physical harm to himself were he permitted to stumble outside to a steep, icy stairway. Moreover, whereas in those cases the plaintiffs at no point resisted the officers, here Lachance clearly did by continuing toward the door even after they grabbed his arms and repeatedly told him to stop walking. Cf. Gray, 917 F.3d at 12 (finding prior case "inapposite" for purposes of clearly established inquiry because there, the plaintiff "present[ed] no significant 'active resistance' or threat" (alteration in original) (quoting Parker, 547 F.3d at 10)).[12]

_____

[12] Because of these material differences with all four cases, we need not address whether Fera, an out-of-circuit district court decision, could have put a reasonable officer in Massachusetts on notice of its holding. See Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011) ("[D]istrict court decisions -- unlike those from the courts of appeals -- do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity," and therefore "[m]any Courts of Appeals . . . decline to consider

- 27 -

Therefore, Lachance has failed to meet his burden of showing that the defendants violated his clearly established rights.

Accordingly, we affirm the district court's grant of summary judgment in favor of the defendants as to the push.

**B.**

We review de novo a district court's grant of a Rule 50(a) motion for judgment as a matter of law. See Hernandez-Cuevas v. Taylor, 836 F.3d 116, 124 (1st Cir. 2016). We must affirm if, after taking the evidence in the light most favorable to the nonmovant, "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Id. (quoting Fed. R. Civ. P. 50(a)(1)).

**1.**

Both parties accept the principle that in order to recover on a Fourth Amendment excessive force claim under § 1983, a plaintiff must show that he suffered damages caused by a defendant's use of such force. Cf. Mendez, 137 S. Ct. at 1548 (citing Heck v. Humphrey, 512 U.S. 477, 483 (1994); Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986)); see also Drumgold v. Callahan, 707 F.3d 28, 48 (1st Cir. 2013) ("As a general rule, '[w]e employ common law tort principles when conducting inquiries into causation under § 1983.'" (alteration in

---

district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity.").

- 28 -

original) (quoting Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir. 2009))). That showing must be made by a preponderance of the evidence. See Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151 (1st Cir. 2006).

The district court granted the defendants' motion for judgment as a matter of law on what remained of Lachance's excessive force claim on grounds that he was only permitted to proceed to trial on claims relating to injuries caused by the kneel, that he failed to present any evidence that any injury that he suffered was caused by the kneel as opposed to the push, and that therefore no reasonable jury could find in his favor.

Lachance argues that the district court erred in finding that there was insufficient evidence of a causal link between the kneel and any of his injuries.[13] The defendants defend the district court's ruling that the evidence failed to show that any of Lachance's injuries were caused the kneel.

---

[13] Lachance also suggests an alternative argument that he could otherwise have been entitled to nominal damages. Specifically, he quotes from the district court's summary judgment opinion that "even if [Lachance] cannot prove an injury, he may be entitled to nominal damages if he can demonstrate that he was deprived of a constitutional right" (citing Stachura, 477 U.S. at 308 n.11 ("[N]ominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury.")). But he goes no further than this scant reference and has therefore waived the argument. See Zannino, 895 F.2d at 17. We add that the issue here was with respect to evidence of causation, not of injury.

We conclude that there is just enough evidence from which a reasonable jury could have found it was more likely than not that the kneel caused Lachance some injury additional to the compression fracture. Certainly, much of the evidence in this regard was weak. For example, Dr. Chirkov opined that the kneel could have caused Lachance more pain, but there is little in the trial record to show that Lachance actually suffered any pain from the kneel as distinct from the fracture. Lachance could not remember the incident, and although he testified that he woke up in the hospital with pain in the center of his back, he also testified that the pain he felt at the time of the trial was in the same part of his "middle back where it was broke."

Dr. Chirkov also testified that a bruise on Lachance's midline was "consistent with" a compression mark typically seen on a person who was restrained, but it is not clear from the trial record why the bruise was any less consistent with a bruise that a reasonable jury would know could have resulted from the hard shove onto the recliner that broke Lachance's back, his subsequent fall to the hard floor on his back with an officer landing on top of him, or his being dragged across that floor on his back -- evidence of which was also presented at the trial. That is not enough to prove causation in this case. Cf. Norwood v. Ghosh, 723 F. App'x 357, 366 (7th Cir. 2018) (finding in the Eighth Amendment context that expert testimony that delays in treatment "could have"

resulted in the plaintiff's condition "falls short of verifying medical evidence that would allow a reasonable jury to find by a preponderance of the evidence that such causation actually occurred"), as amended (Feb. 16, 2018).

Still, Dr. Chirkov also opined to a reasonable degree of medical certainty, which is consistent with the preponderance of the evidence standard, see O'Brien, 943 F.3d at 522 n.4, that two bruises on Lachance's upper back were "caused" by "pressure on his back, physical compression" of the sort "usually . . . see[n] . . . on restrained people."[14]  A reasonable jury could have attributed great weight to this unrebutted expert testimony and found that the bruises were caused by restraining as opposed to the push.  Of course, Lachance experienced numerous forms of restraint apart from the kneel, including the police officers holding onto his arms, dragging him by the wrists, flipping him over, pulling his arms back to place him in handcuffs, and locking his legs.  But the only restraint recounted at trial that linked at all to Lachance's back was the kneel.  Therefore, a reasonable jury could have found that it was more likely than not that at least some of the bruising on Lachance's upper back was caused by the kneel.

---

[14] The defendants moved to strike this portion of Dr. Chirkov's testimony, among others, on grounds that it was not part of his Federal Rule of Civil Procedure 26 disclosure and inconsistent with his deposition testimony.  The court did not grant the motion; rather, it permitted the defendants to cross-examine Dr. Chirkov again, which they did.

That Dr. Chirkov testified that any injuries apart from the compression fracture were insignificant is of no matter. What is significant injury from a clinical perspective is something entirely different from what is sufficient to support a finding of liability on a Fourth Amendment excessive force claim. See Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (noting in the Eighth Amendment context that the Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim"); Alexis, 67 F.3d at 353 n.11 (noting in the Fourth Amendment context that minor injuries can support an excessive force claim and citing bruises as an example of such injuries).

**2.**

Unlike public officials, municipalities do not enjoy qualified immunity, so the fact that officers may be entitled to such immunity for some action does not automatically absolve their municipal employer from being liable for that same action. See Davis v. United States, 564 U.S. 229, 248 n.9 (2011); Walden v. City of Providence, 596 F.3d 38, 55 n.23 (1st Cir. 2010). Moreover, we have observed that "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity." Raiche, 623 F.3d at 40 (citing Foster v. McGrail, 844 F. Supp. 16, 29 (D. Mass. 1994)). We have found, and the parties have given us, no reason to disturb that observation.

Notwithstanding this precedent, the district court granted the defendants' motion for judgment as a matter of law on Lachance's remaining counts -- the Monell claim, which the defendants did not seek judgment on, as well as the assault and battery and negligence claims -- for the same reason that it granted the motion as to his excessive force claim, that is, his failure to produce sufficient evidence that the kneel caused him any injury.

Lachance argues that the district court erred because he was in fact subjected to constitutionally excessive force and because even if no injury was caused by the kneel, he could have recovered on his state law claims for injuries caused by the push notwithstanding the court's summary judgment ruling because the defendants failed to raise as a defense a Massachusetts law analogue to federal qualified immunity. These arguments are not new; Lachance raised them before the district court, and they were largely the basis for the court's denial of summary judgment on those counts.

The defendants respond that the assault and battery and negligence claims fail because there was no evidence that the officers intentionally used unjustified force or acted negligently and because assault and battery claims "rise and fall" with § 1983 claims, and that the Monell claim fails because there was no underlying constitutional violation.

The district court's order was based on the premise that, because the defendant officers enjoyed federal qualified immunity on the excessive force claim as to the push, the town could not be liable under Monell and the individual officers could not be liable under state tort law for injuries that might have resulted from the push. This was error.

For example, the defendants cite Gray, 917 F.3d 1, for the proposition that "assault and battery . . . claims 'rise and fall with . . . [her] § 1983 claim.'" Id. at 14 (alteration in original). They did the same in their motion before the district court. In Gray, we merely restated a "concession" offered by the plaintiff in her briefing, which we accepted for purposes of that case only. Id. We have in the past held that "[w]here a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the common law assault and battery claims." Raiche, 623 F.3d at 40. That rule is inapposite here where the district court did not assess the reasonableness of the officers' actions in granting the defendants' motion.

Similarly, it is true that "Monell can impose municipal liability only for underlying, identifiable constitutional violations . . . ." Kennedy v. Town of Billerica, 617 F.3d 520, 531 (1st Cir. 2010). But the district court ruled only that no

reasonable jury could find a constitutional violation as to the kneel due to the lack of evidence of causation; it did not rule at summary judgment or after the trial that no reasonable jury could find that the push was not a constitutional violation.

The defendants offer numerous alternative bases for affirmance. We decline to exercise our discretion to affirm on any of those bases, finding it "appropriate to leave such a matter for the district court to address in the first instance on remand, especially when the grounds are not fully developed or fairly contested on appeal," as is the case here. Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 39 (1st Cir. 2020).

Accordingly, we vacate the district court's order granting the defendants' motion for judgment as a matter of law.

### III.

For the foregoing reasons, we **affirm in part** and **vacate in part**. We vacate and remand the district court's order granting the defendants' motion for judgment as a matter of law for further proceedings consistent with this opinion. Costs to appellant.